HERRING-CURTISS COMPANY, Plaintiff, *v.* GLENN H. CURTISS and Others, Defendants.

Supreme Court, Steuben County, May, 1923.

**Accounting — charges of conspiracy resulting in bankruptcy of corporation — evidence insufficient to establish right to relief.**

It is the well-settled law of this state that a judgment obtained by fraud is subject to collateral attack in a court of equity.

At or immediately after the organization in March, 1909, of the plaintiff, a domestic corporation, all of its capital stock of $360,000, divided into shares of $100 each, except six shares, was issued to one H. in consideration of his conveyance to it of the real estate, equipment and business of another domestic corporation which business it was intended to be continued and the plant to be used for plaintiff's contemplated business of manufacturing vehicles used in transportation by land or in the air or in the water, and to operate, sell or traffic in the same and to own all manufacturing properties, patents, inventions, etc., which might properly pertain to said business. The excepted shares of stock, though paid for by H., were at his request issued to certain persons who acted as dummy incorporators of plaintiff. Upon the filing of a petition in bankruptcy against the plaintiff on April 1, 1910, the receiver appointed took possession of its factory, plant, assets and property and so continued until they were turned over to him as the trustee in bankruptcy. A petition by H., who was a director, for leave to contest the bankruptcy proceedings on the part of the alleged bankrupt having been denied, he intervened as a creditor. At the close of the bankruptcy litigation which involved the same questions as in the present action, the special master found that the insolvency of plaintiff was not caused by fraud nor was it the result of a conspiracy. The report of the special master that the allegations of the involuntary petition were sustained by the facts and that the plaintiff was insolvent at the date of its filing, was confirmed in due course. Under the authority of the order of adjudication entered on said report, the receiver was appointed trustee in bankruptcy, duly qualified and has fully administered the bankrupt estate except litigation still pending and certain matters connected with the present action, claimed to be assets. *Held*, that the adjudication of bankruptcy finally and conclusively established the insolvency of the plaintiff as of the date of the filing of. the petition in bankruptcy and was, as between the parties to the bankruptcy proceedings and their privies, *res adjudicata* as to the facts and the subsidiary question of law upon which it was based.

Upon the theory that the bankruptcy was the outcome of a deliberate and premeditated plan arranged by certain of the defendants to so conduct the business affairs of the plaintiff that insolvency must necessarily ensue, and upon allegations that by reason of the insolvency, so wrongfully and fraudulently brought to pass, large monetary gains were ultimately derived by those defendants or some of them from or out of the property and property rights belonging to plaintiff of which it was so improperly deprived and which through such fraudulent insolvency came into possession of such defendants, plaintiff seeks an accounting for these gains or profits and asks that the same, when ascertained, be paid over for the benefit of plaintiff, its stockholders and creditors. *Held*, that after the adjudication in bankruptcy plaintiff had no right, title or interest

Supreme Court, May, 1923.    [Vol. 120

in the bankrupt estate except for any surplus after the debts and expenses were fully paid.

While the plaintiff by its omission to contest the bankruptcy proceedings or to permit the same to be done in its behalf, in effect admitted insolvency and consented to the adjudication in bankruptcy, thereby removing itself from the litigation which followed the filing of the petition in bankruptcy, yet as the plaintiff was during all that litigation under the control of its directors charged herein with fraud, the findings of fact in that litigation were not *res adjudicata* as against the plaintiff in the present action.

Upon consideration of the evidence judgment in accordance with the opinion directed, with costs in favor of each answering defendant, unless formally waived, the direction as to costs to include the trustee in bankruptcy who was absolved from the charges of fraud at the close of the plaintiff's case but against whom the action was not then dismissed.

SUIT for an accounting.

*William J. Maloney* (*James M. E. O'Grady*, of counsel), for plaintiff.

*Hornblower, Miller & Garrison* (*Cortlandt Field Bishop* and *A. DeWitt Mason*, of counsel), for defendant.

*William V. L. Turnbull*, for defendant Robert C. Turnbull and another, as executor.

*James McCall*, for defendant Gabriel H. Parkhurst, as trustee.

*Robbins, Phillips, Green & Robbins* (*Fred A. Robbins*, of counsel), for the remaining defendants.

SAWYER, J.    Plaintiff is a domestic corporation organized March 20, 1909, and having its principal place of business at Hammondsport, N. Y.    Its certificate of incorporation provides its purpose to be, among other things, the manufacture, purchase or otherwise acquiring and owning of aeroplanes, airships, flying machines, all kinds of motors, motor cycles, balloons and other vehicles used in transportation by land or in the air, or in the water and on the land, and to operate, sell or traffic in the same, together with the acquiring and owning of all manufacturing properties, patents, inventions, etc., which may properly pertain to said business.

Its authorized capital stock is $360,000, divided into shares of $100 each, 1,800 of which are preferred and 1,800 common stock. At or immediately after its organization all of its capital stock except 6 shares was issued to one Augustus M. Herring.    The excepted 6 shares of stock were paid for by said Herring but at his request issued to certain gentlemen who acted as dummy organizers of the corporation.

In consideration for the stock issued to him Mr. Herring conveyed to it the real estate, plant, equipment and business of Glenn H. Curtiss and the G. H. Curtiss Manufacturing Company, a concern

theretofore doing business at Hammondsport, which he had acquired and which business was intended to be continued and its plant also used for plaintiff's contemplated manufacturing business. These buildings, machinery and equipment were shortly after largely increased to meet what plaintiff deemed its probable needs, and it seemed to be launched upon a profitable and successful career.

In the fall of 1909 it, however, began to be hampered by lack of ready cash and its affairs became somewhat involved; a situation which increasingly continued until April 1, 1910, when the defendant Bank of Hammondsport with certain other creditors filed against it a petition for involuntary bankruptcy; following which the defendant Gabriel H. Parkhurst was appointed as its receiver and on the seventh day of April took possession of the factory, plant, assets and property of plaintiff and so continued until they were turned over to him as trustee in bankruptcy, as later will appear. After the involuntary petition was filed Mr. Herring, who was a director of the company, sought leave to contest in its behalf the bankruptcy proceedings and permission therefor having been refused, intervened as a creditor, following which a very active and earnest trial of the question of plaintiff's insolvency was had. The special master to whom the matters were referred reported that the allegations of the involuntary petition were sustained by the facts and that plaintiff was insolvent at the date of its filing. This report was confirmed by the United States court and a decree adjudging the plaintiff to be bankrupt was made upon December 2, 1910, and filed six days later. Under the authority of this judgment the defendant Parkhurst was appointed as trustee in bankruptcy, duly qualified and has fully administered the bankrupt estate, with the exception of certain litigations still pending and certain matters connected with this action claimed to be assets. By the bankruptcy adjudication the insolvency of plaintiff upon April 1, 1910, is here finally and conclusively established, for as between the parties to that proceeding and their privies it is *res judicata* as to the facts and the subsidiary question of law on which the finding is based. *Graham* v. *Boston, H. & E. R. Co.*, 14 Fed. Rep. 753; 118 U. S. 161, 178; *Matter of Hecox*, 164 Fed. Rep. 823; *Manson* v. *Williams*, 213 U. S. 453; *Gratiot State Bank* v. *Johnson*, 249 id. 246; *Corbett* v. *Riddle*, 209 Fed. Rep. 811.

Plaintiff seemingly admits the correctness of this legal proposition for its complaint, while exceedingly voluminous, is, generally speaking, based upon the theory that the bankruptcy was the outcome of a deliberate and premeditated plan, arranged by

certain of the defendants, to so conduct the business affairs of the plaintiff that insolvency must necessarily ensue. Its claim is that by reason of the insolvency, so wrongfully and fraudulently brought to pass, large monetary gains were ultimately derived by those defendants or some of them from or out of property and property rights belonging to plaintiff of which it was so improperly deprived and which, through such fraudulent insolvency, came into possession of such defendants; upon such allegations plaintiff seeks an accounting for these gains or profits and demands that same, when ascertained, be paid over for the benefit of plaintiff, its stockholders and creditors.

That the equitable powers of the court may be invoked in a collateral action for relief against a judgment fraudulently obtained is well-settled law in this state. *Richardson* v. *Trimble*, 38 Hun, 409; *Baker* v. *Byrn*, 96 id. 115; *Mandeville* v. *Reynolds*, 68 N. Y. 528; *Ward* v. *Town of Southfield*, 102 id. 287.

Many of the more important acts and matters relied upon as evidencing fraud were alleged, and constituted the gravamen of the charges, in the contest made by the intervening creditors and tried before the special master. These facts and particularly the alleged unlawful diversion of plaintiff's moneys were specifically passed upon by him adversely to the contention there urged and which is here once more advanced. His findings were confirmed by the Federal District Court and the bankruptcy adjudication had thereon. Defendants now insist that such findings are likewise *res judicata* as against this plaintiff and cannot be again litigated; that plaintiff, having been a party to that proceeding, cannot by an action such as this set aside and avoid the determination there made. *Gratiot State Bank* v. *Johnson, supra; Corbett* v. *Riddle, supra*. In the sense that the bankruptcy proceeding was originally instituted against plaintiff, it may be conceded to have been a party to that proceeding; but, in fact, while the object was to establish its insolvency, and to that extent concerned it, plaintiff was not a party to the litigation which followed the filing of the bankruptcy petition. That was entirely between creditors, plaintiff occupying meanwhile the position of an interested onlooker. By its omission to contest the proceeding or to permit same to be done in its behalf, it in effect admitted insolvency and consented to the adjudication, thereby removing itself from the litigation which followed, the findings of which are now urged to be a bar to its prosecution of the present action. From my viewpoint the fallacy of the claim of *res judicata* is demonstrated by the fact that plaintiff was during all that litigation under the control of the directors here charged with fraud and by whom its default and insolvency were directed

and admitted. While the question is not without difficulty, I am not prepared to hold that corporate directors can absolve themselves from responding for fraud by conceding the very thing the fraudulent acts were committed to bring about.

In the discussion of the frauds alleged by plaintiff it will be impossible to consider in detail the multitude of acts relied on by plaintiff in support of its contention. As is not unusual, practically everything done by the defendants, then controlling plaintiff corporation, has been seized upon as evidence of wrongdoing. The trial occupied many weeks. The record contains several thousand typewritten pages of testimony, supplemented by between 1,200 and 1,300 exhibits, some of them very voluminous. This bare recital and the fact that there has been submitted nearly 1,100 proposed findings of fact, indicates the impossibility of a detailed reference in a memorandum of this character to all the evidential facts. In the main, however, the charges are directed toward certain important and outstanding matters as founded in wrongdoing, attention being directed to other things as evidence of a general plan wrongful in purpose. The former will need some discussion, but prior thereto it may be briefly said that certain of the defendants should be exonerated from wrongful participation in the acts complained of.

These defendants are Cortlandt Field Bishop, Thomas S. Baldwin, Bank of Hammondsport, Henry L. Kleckler, Harry C. Genung, G. Ray Hall (now deceased and whose estate is represented in this action by his personal representative) and Gabriel H. Parkhurst, as trustee, etc.

As against Mr. Parkhurst the charges were dismissed at the close of plaintiff's case, he being retained in the action only as the representative of the bankrupt estate for the protection of its creditors and stockholders in event plaintiff should succeed. Cortlandt Field Bishop was one of plaintiff's stockholders, influential in its organization and represented upon its board of directors by his secretary, Arthur W. Gilbert. He never had any part in the management of plaintiff's ordinary affairs, his activities being confined to arranging for the European flights by Mr. Curtiss, from which plaintiff and its aeroplanes became widely advertised, together with some endeavor toward the end of plaintiff's career to compose differences between its warring directors and avoid, what appeared to be inevitable, its failure. He with the others is, however, charged with extensive wrongdoing, obviously in the endeavor to bring into the action everybody who by any possibility could be held responsible. The summons and complaint were not

47

served on him until after the trial was well under way, and when he answered he united in plaintiff's demand against his codefendants, whereupon plaintiff withdrew its charges against him. Under the circumstances the complaint against him must be dismissed.

The Bank of Hammondsport, N. Y., was the main banking depository of plaintiff during the year of its business life, and before the organization of plaintiff had served in like capacity for the G. H. Curtiss Manufacturing Company of which defendant Glenn H. Curtiss was the principal owner and manager. One of the directors and the general counsel of the bank was Monroe Wheeler who was likewise the president of plaintiff and is named as a defendant herein. This bank became a creditor of the plaintiff to a very considerable amount and, its indebtedness not being paid, instituted the involuntary bankruptcy proceedings and prosecuted them to a successful conclusion. The bank's affairs appear to have been entirely in the control and management of its then cashier, W. W. Brundage, and it is charged that Mr. Brundage knew of the alleged conspiracy concocted against plaintiff and in his dealings with it lent himself thereto, thereby impressing his bank with knowledge thereof; that the bankruptcy proceedings were only instituted after consultation with others of the defendants and as a part of and in culmination of the prearranged fraudulent conspiracy, and that the subsequent prosecution of the proceeding to a successful end was likewise in furtherance of the same wrongful purpose. There can be no doubt but this defendant became cognizant of plaintiff's failing circumstances. It was interested in defendant's welfare, not only because it was a customer of the bank but a borrower from the bank. Its confidence in the reliability of its customer had been manifested by its readiness to loan it up to the legal limit and to supplement that loan by another of a considerable amount, made indirectly. That it gradually lost that confidence and began to treat with plaintiff at arm's length is equally true. Many things which would put a cautious business man upon his guard were apparent, and the bank, acting through Mr. Brundage, followed the normal policy adopted by financial institutions toward a shaky customer. It refused to accept plaintiff's drafts on customers for general deposit and permitted same to be checked against only when they had been met by the drawee. It refused to certify plaintiff's checks and in other ways manifested a cautious disposition to protect itself from loss. It had outstanding, drawn to plaintiff's order, a $10,000 draft. But the draft was not in the possession of plaintiff as the bank unquestionably knew, for it later made affidavit that its indebtedness was an unsecured one. Plaintiff urges that the affidavit was

knowingly false but I am unable to see anything which points to such a proposition. It may have discussed with Mr. Curtiss and others its intention to institute bankruptcy proceedings but such a discussion, if had, does not tend to sustain plaintiff's allegations of an evil or improper intent. Threats by creditors to put their debtors in bankruptcy are of everyday occurrence and calm, business discussion of the situation between gentlemen, or more heated interviews between men of less business experience and less poise, must be weighed in the same scale, but in fact the case fails to show that any such discussion was had. The nearest approach to it is found in the testimony of the witness Waite, that he and Mr. Curtiss were told by Mr. Brundage that a petition in bankruptcy had been prepared and that it was the intention of the bank to put plaintiff into bankruptcy; this together with the conversation between Mr. Brundage and the defendant Wheeler, wherein the debt due the bank and its decision to take such action were presented to Mr. Wheeler and he replied that his situation was such that he could have nothing to do with it and some other attorney would have to be retained by the bank is all there is on the subject. In this connection I do not overlook the interview at Judge Wheeler's house upon the evening of March thirty-first. The account of this interview, in some respects, seems quite improbable, and this with certain other matters testified to by the same witness which are palpably untrue, detracts largely from its evidential force. However, both the defendants Baldwin and Lena P. Curtiss are said by the witness to have been present; defendant Baldwin was subsequently called as a witness for defendants and failed to deny this occurrence. The defendant Lena P. Curtiss was available to defendants but was not called as a witness, while the testimony of the defendant Glenn H. Curtiss upon the subject is exceedingly vague; under such circumstances it may be deemed that in a general way the things said to have occurred happened. Even so, I am not prepared to hold that an effort by a creditor in connection with his failing debtor, who knows that bankruptcy proceedings are about to be instituted against him, to protect the assets and business by way of a receivership pending the adjudication in bankruptcy is a wrongful act, or that the presence of its attorney, Mr. Nichols, and Judge Wheeler at that consultation charges it with responsibility for previous wrongdoing.

Judge Wheeler was a director and the general counsel of the bank and as between it and plaintiff his position was, of course, antagonistic. He was not, however, one of the active managers of the bank and paid little attention to its affairs. Under such

circumstances the bank is not chargeable with his knowledge obtained in his capacity as an officer of plaintiff. It dealt in good faith and so far as plaintiff is concerned was entitled to assume that Judge Wheeler was equally sincere. Neither does the fact that after the petition in bankruptcy had been filed and the insolvency of the plaintiff occurred, he on occasions represented the bank before the special master, presenting the facts which legally warranted the intervention of the Federal court, charge the defendant bank with knowledge of preceding conspiracy or frauds. The arrangements for the receivership pending the adjudication and the presentation to the court of the fact of insolvency were for the interest of both plaintiff and all its creditors, including the bank; under all these circumstances I am satisfied that the allegations of wrongdoing made against the Bank of Hammondsport are not sustained.

The defendant Thomas S. Baldwin has spent nearly his entire life in aerial enterprises and has become well known to the general public as well as to those engaged in similar work. He was a director of plaintiff from its organization until after the insolvency and became such director, as he says at the request of either Mr. Bishop or Mr. Herring, whom he had known long before, as he also had Mr. Curtiss. This is denied, but it is evident that all of those three gentlemen had confidence in him and because of his reputation and capacity had agreed upon him as one of the directors; and in my judgment the trust so manifested was well reposed. Mr. Baldwin was not a stockholder nor had he any financial interests in the company. He attended meetings of the board of directors and performed his duties punctually and with seeming good faith. He had some personal dealings with the company but same were upon an ordinary business basis; all he received from it was paid for, and paid in full without difficulty. His confidence in Mr. Herring became much shaken and that, in the business difficulties, he to some extent opposed Mr. Herring's desires and upheld the things done by Mr. Curtiss and Judge Wheeler, among other things voting for certain resolutions now bitterly contested, is true. Those facts in and of themselves are insufficient to charge him with fraudulent practices. We can concede for the purpose of argument that he was mistaken in his judgment, but a director is not to be held personally for mistaken judgment; his official actions must be either tainted with actual fraud, or so utterly out of character as to repel any inference except that of actual fraud, before errors of judgment involve personal responsibility. Mr. Baldwin, while a practical air man and balloonist, had not, so far as the evidence shows, had previous

corporate experience. He was associated with those in whose judgment and good faith he had confidence and undoubtedly relied to some extent upon the legal knowledge and unsullied reputation borne by Judge Wheeler. He had nothing to lose, nothing to gain, and in fact did not profit from its business nor from its failure. His only real interest was, I take it, the development of the science of aeronautics, which had been his life work. If he was mistaken, the circumstances were such as to render his mistakes excusable and the case is devoid of evidence of evil intent so far as he is concerned.

The defendants Henry L. Kleckler, Harry C. Genung and G. Ray Hall were employees of plaintiff; Genung having been the office manager and, under Mr. Curtiss, in general charge of the business; Hall the head bookkeeper and in immediate charge of that department; Kleckler an expert mechanic and in general charge of the shops, especially the designing and construction of motors. As employees it was, of course, incumbent upon them to obey the instructions of their superiors and most of the evidential facts relied upon by plaintiff to connect them with the alleged fraudulent practices are things done by them in connection with the routine of its business affairs. Whatever motives may have animated those controlling the business and led to their instructions, either general or specific, knowledge of same cannot be imputed to these defendants. That they came to know the business to be in an unsatisfactory condition is true, but to my mind there is no evidence that anything was knowingly done by them to either institute or increase such condition or to accelerate the end. They obeyed orders, and where personal responsibility rested upon them, seem to have done the best they could and were in no way responsible for the disastrous outcome of the venture. This is especially true of the defendants Kleckler and Genung. As to Mr. Hall, at about the time of the failure there was some conversation between him, Curtiss, Waite and others, from which it is clear Hall was acquainted with the general situation and in the course of which, under the direction of the defendant Curtiss, he is said to have given to the witness Waite a list of plaintiff's creditors, to be used, as Waite says, for improper purposes. Even Waite does not say that Hall knew the purpose for which the list was delivered to him to be an improper one; neither does any one else. As has been stated, Hall was a mere employee, obeying the instructions of his superiors, and an inference of fraudulent intent cannot be drawn from his actions, inasmuch as same are, at least, equally consistent with innocent and honest design. Neither of these three defendants had any financial interest in the plaintiff corporation. That they

acquired an interest in certain other corporations later organized by Mr. Curtiss, which interests proved to be valuable, is conceded. Whether they are obliged to account for the moneys which came to them in that manner on the theory that valuable assets of plaintiff were secured by Mr. Curtiss through the bankruptcy and formed a part of the assets of the subsequent corporations, presents a question not necessary just now to discuss. For the present all that is needful to say is that they are found by the court to have been entirely upright and honest in their dealings with and for plaintiff and are exonerated from all charges of either actual or constructive fraud against it.

The defendants, the Curtiss Exhibition Company, the Curtiss Aeroplane Company, the Curtiss Motor Company and Curtiss Aeroplane and Motor Corporation are corporations organized from time to time between the filing of the involuntary petition of bankruptcy and about the early part of the year 1916 by the defendants Curtiss and Wheeler in connection with other persons. It is claimed that various assets of plaintiff which had come into the possession of either Mr. Curtiss or Judge Wheeler or both, including discoveries and earnings of Mr. Curtiss, were transferred from them to one or the other of these companies, with the result that large profits accrued to certain of the individual defendants from these companies so later organized. Whether this is true or not the proofs do not sustain that claim as to the defendant Curtiss Engineering Company. This company was organized by Mr. Curtiss in the latter part of the year 1918 and became the owner of some portion of the stock of the Curtiss Aeroplane and Motor Corporation, but as to whether it had ever received anything by way of property or dividends upon this stock, the proofs are entirely silent, so if plaintiff be held to have a valid claim for an accounting against the other corporate defendants, the same cannot, in the absence of proof that it has received either property or benefits from property belonging to plaintiff, be extended to that defendant.

The defendant Lena P. Curtiss is and was the wife of the defendant Glenn H. Curtiss. Mr. Curtiss began his business career without money or influential backing and the success he has attained has been due entirely to his own ability and efforts. Mrs. Curtiss seems, from the time of her marriage, to have participated and assisted in his business affairs. She had aided him in the business of the G. H. Curtiss Manufacturing Company and after the transfer of the assets of that company to the Herring-Curtiss Company continued in the office of the latter company as an employee down to the time when the receiver took charge. She took charge to some extent of the incoming mail, distributed it to those in charge

of the immediate subjects to which it related, assisted somewhat with the bookkeeping and made herself generally useful. It may well be assumed that when Mr. Curtiss was absent she watched over his affairs and looked out for his interests as well as she could. How much or how little she knew of his plans or of his actual intentions, good or bad, is known, of course, to them alone; our conclusion must depend entirely upon the inference to be drawn from the fact that they were husband and wife, that their relations were harmonious and that she was disposed to and did aid him whenever, and as best, she could. Notwithstanding the severe criticism which has been directed against her, based among other things on alleged inaccuracies in the plaintiff's books and accounts, there are but two things which to my mind in any manner could connect her with the insolvency. The first is that her husband paid to her for herself some portion of the moneys derived from the flights made in Europe in the late summer of 1909. The other is her presence at the conference at the home of Judge Wheeler upon the evening of March 31, 1910. As to the first, if under her husband's contract his entire time belonged to plaintiff, the question as to whether his earnings during that time could rightfully become hers by gift from him is necessarily involved and her acceptance of the gift is properly a subject for determination in this action. If she did not have that knowledge she might well have been justified in the belief that her husband, who had in a few years worked his way from nothing into a worldwide reputation, might properly give her a portion of the moneys which his efforts had brought to him but her right to retain the gift and its earnings would still be properly before the court. As to the conference at Judge Wheeler's house, in the absence of actual knowledge of improper conduct of the affairs of plaintiff by her husband and Judge Wheeler, she is in exactly the same situation as was the defendant Baldwin. That conference involved not the forcing of the company into bankruptcy but the protection and preservation of its assets and business after the filing of the petition in bankruptcy, which all the parties understood had been prepared and was to be shortly presented to the court. Like the defendants Kleckler, Genung and Hall, she became interested, presumably by gift from her husband, in the corporations afterwards organized by him, and from some of those connections obtained a very large sum of money, for which plaintiff demands that she account to it upon the same theory as that advanced in the demand for a similar accounting by the other employee defendants.

From the organization of plaintiff company down to the time when it was taken over by the receiver in bankruptcy proceedings,

Supreme Court, May, 1923.	[Vol. 120

it was under the immediate management and control of the defendant Monroe Wheeler (who died after the beginning of the trial and whose estate is now represented by his executors), who was its president, and the defendant Glenn H. Curtiss, who was its vice-president and general manager, although until September 25, 1909, he did not have the formal title of the latter position.

Mr. Curtiss, who apparently is a man of capacity and business acumen, was the active spirit in the corporation and Judge Wheeler, who was his personal counsel, was entirely in his confidence. Practically all the matters and things of which plaintiff complains were had and done at the suggestion or under the direction of these two defendants and if they acted in bad faith or in such manner that the law will imply bad faith, they, of course, must respond to plaintiff for its loss or damage thereby caused. In many instances the things pointed out by plaintiff as evidencing bad faith, fraud and conspiracy seem to have been ordinary transactions had in the usual course of business, with here and there a case of poor judgment, or an erroneous entry in the books, afterwards sought to be corrected, or an entry which, after this lapse of time, cannot be explained. But for the insolvency no suggestion of criticism as to these matters would properly have been made and it is only by a most strained interpretation that any suspicion of fraud can be drawn therefrom. The books of accounts have, at the request of plaintiff's counsel, been subjected to a microscopical examination by a professional accountant. It is a fair assumption that he was looking for something wrong and it would have been surprising if he had not found something which he thought was wrong. My own study of them in the light of the information he has given us, fails to convince me that they contain intrinsic evidence of fraudulent purpose upon any one's part. It is true that it is now difficult, in some instances quite impossible, to understand some of the transactions from the entries remaining to us. This I think would be true of any set of books which had been unused and uncared for and largely abandoned for a period of nearly ten years, passing through various hands and through one fire. A number of the records are now missing. Some of those by whom or under whose supervision they were kept are either dead, missing, or after the lapse of years, unable to recall the transactions to which the entries relate. Letters have been produced, claimed to bear upon their faces ev dence of improper intention; not a few of them unexplained, either by word of mouth or by surrounding circumstances, might be deemed incriminating, but in almost every instance, when the facts are understood, they are as susceptible of a construction of good faith as of bad and in the other

instances, such as that of Mr. Curtiss' telegram of March 20, 1910, to Mr. Mann and the letter of March 22, 1920, to Mr. Bishop, the apparent facts were such that he or any other layman might well have believed the statements to be true. These last, with other letters and telegrams between Mr. Curtiss and parties interested in plaintiff, as a whole, indicate that Mr. Curtiss was then, at least, engaged in an attempt to sustain a falling structure rather than attempting to complete its ruin by dislodging its cornerstone.

Before March, 1909, there had been paid to the G. H. Curtiss Manufacturing Company $3,700.58 in deposits upon orders for the machines manufactured by that company. In the inventory of plaintiff's assets, made immediately following its organization, this item was referred to with the suggestion that it be either charged against the total assets transferred, valued at $82,272.11, or the G. H. Curtiss Manufacturing Company should reimburse the plaintiff for the amount. The failure to pay these moneys to plaintiff is now put forward as one of the false and fraudulent transactions upon the part of Mr. Curtiss and Mr. Wheeler. It must be borne in mind that the property transferred by Mr. Curtiss and the G. H. Curtiss Manufacturing Company, according to plaintiff's own inventory, exceeded in value by more than $20,000 the price for which the owners sold, they retaining its cash and bills receivable and taking care of its bills payable, with the exception of $5,000 in notes, which were assumed by its vendee. In the contract between the company and Mr. Herring these particular moneys were not mentioned but the understanding that they were to be retained by the Curtiss Company is evident from the transaction itself and is substantiated by a subsequent payment by plaintiff of something over $300 upon similar accounts. Even if it were otherwise, the complete answer to the entire claim is that that deal was entirely one between Mr. Curtiss and Mr. Herring from whom plaintiff purchased the property. Any claim for reimbursement which existed in favor of the company was against its vendor, Mr. Herring, instead of Mr. Curtiss, with whom it had no relations in that transaction. The question is, however, not of much importance at this time for the complaint makes no claim arising out of this transaction and not until the trial was any attempt made to put the matter forward as one of the steps in the alleged fraudulent conspiracy. It is not only entirely outside the pleadings but it seems incredible that any of these parties, before their proposed new corporation had been organized, had their heads together in a scheme to defeat its purpose. Retention of these moneys involves neither actual nor constructive fraud upon plaintiff and is not available to it in this litigation.

Sometime in or just before the year 1907 the defendant Glenn H. Curtiss, as well as many others, had become interested in the possibility of manufacturing and flying a man-carrying, heavier than air machine, and about October of that year a voluntary unincorporated association, called the Aerial Experiment Association, was formed, composed of Alexander Graham Bell, J. A. D. McCurdy, Thomas Selfridge, F. W. Baldwin and the defendant Curtiss, for the purpose of furthering such project. Mr. Curtiss was made the director of its experiments and during the year a number of aeroplanes were manufactured by it, one of which, called the June Bug, was largely designed by Curtiss and built in about June, 1908, under his direction. This machine Mr. Curtiss successfully flew at Hammondsport, N. Y., upon July 4, 1908, it being the first successful public flight of an aeroplane in America and by which he won a prize offered by the Scientific American for a flight of more than one kilometer in distance. Following this, the Experiment Association continued to work upon drawings and designs for machines of this character, subsequently building and successfully flying another machine, called the Silver Dart. In the meantime Mr. Curtiss flew the June Bug on a number of different occasions, thereby acquiring a very considerable general reputation in the manufacture and flying of aeroplanes. After the success with the Silver Dart, and in about January, 1909, Mr. Curtiss received an offer from the Aeronautical Society of New York (an organization of gentlemen interested in aeronautics and kindred sciences) of $5,000 to build for it an aeroplane and give therewith at least two exhibitions to be conducted for the society. This order was accepted by him, $500 paid upon it, and during the winter following the machine was partially designed and work upon it commenced in the shops of the G. H. Curtiss Manufacturing Company. This contract, and the machine so far as completed, was turned over to Mr. Herring and by him to plaintiff, with the other property of the G. H. Curtiss Manufacturing Company and was completed by plaintiff, substantially according to the plans of Mr. Curtiss. In the summer of 1909 the conditions as to flights were complied with by Mr. Curtiss at Morris Park, N. Y., but some controversy arose as a result of which Mr. Curtiss accepted $4,000 in full settlement for the unpaid balance due upon the machine, together with $150 for certain repairs which had become necessary. Of these moneys Mr. Curtiss paid the plaintiff $3,000, retaining $1,650 as pay for the previous work and personal compensation for making the stipulated flights, success of which was by the contract a condition precedent to the acceptance of the machine. This adjustment was made without consultation with

or authorization by plaintiff's board of directors and was unknown to any of them until discovered by Mr. Herring some time later. It is now claimed that plaintiff was entitled to the entire sum of $5,150 and that retention of any part thereof by Mr. Curtiss, or a discounting by him of the contract price, was a fraudulent act had pursuant to the conspiracy to wreck the company, upon which this action rests. It is convincingly shown that by the payment of $3,000 plaintiff had ample compensation for the cost of the machine with a reasonable profit thereon, so that the criticism reaches only to a question of profit. The $500 originally paid Mr. Curtiss must be treated precisely the same as the $3,700 advance payment upon motorcycles received by him and hereinbefore referred to. As to the $500 allowance claimed to have been made the Aeronautical Society from the purchase price, Mr. Curtiss was at the time the active managing officer of plaintiff and in an ordinary business transaction his position carried with it authority to use his best judgment in the adjustment of disputes involving the company. Plaintiff's theory that the claimed reduction is a subterfuge and that the $500 was actually paid to Mr. Curtiss is supported by no proof whatever and must be rejected. The remaining $1,150 Mr. Curtiss concededly, and as I think unjustifiably, retained for himself. When the company was organized, he had made with it a contract for the term of three years from March 20, 1909, agreeing to hold such office in said company as he might be elected to by the stockholders, or directors, and during that time to devote all his time and attention to the business affairs of the company, as directed by the board of directors. This included the development and promotion of the business of the company as set forth in the certificate of incorporation and had in contemplation the provision of the article of incorporation, that plaintiff was to not only manufacture and sell motorcycles and aeroplanes but was to *operate* the same. Whether plaintiff's directors would have been authorized to have ordered him to engage in flying aeroplanes nevertheless is doubtful. The art of flying was then in its infancy; notwithstanding the development it has since had, it is still extremely dangerous to life and limb and was then so exceedingly hazardous an undertaking that those engaged in it were considered rash to the point of recklessness. While it is not necessary for the purpose of this action to determine the question, the conditions were such that Mr. Curtiss would probably have been justified in the position that obedience to such a direction was not within the scope of his contract, particularly in view of the fact that his yearly compensation was a wholly inadequate return for that kind of service. Nevertheless his whole

time belonged to plaintiff, and if he chose to voluntarily assume the risk incident to flying this aeronautical machine, plaintiff was entitled to the earnings therefrom. He might fly or not as he chose, but, having elected to use plaintiff's time in that manner, he could not retain from plaintiff that which had been earned during time that belonged to it.

The final payment for this machine was made to Mr. Curtiss upon July nineteenth, but was not reported by him to the office until after his return from Europe some months later, when $3,000 thereof was credited as and for a machine sold to Mr. Curtiss personally. That this credit was made under the direction of Mr. Curtiss must be admitted, but I find myself utterly unable to understand how that fact, even if it be true that Mrs. Curtiss herself actually made the entry, sustains any charge of fraud against her. As has been hereinbefore stated, she was merely an employee and, but for the fact that she as Mr. Curtiss' wife and afterwards acquired a considerable property through his gifts, would be beyond suspicion of wrongdoing. There is no proof that either Judge Wheeler, Mr. Baldwin or any others of the directors or managing officers, except Mr. Herring who discovered that the books did not contain any credit for the machine, knew anything about the matter or ever heard of it until long afterwards. It follows that whatever Mr. Curtiss did in this respect was upon his own volition and without any understanding with anybody about it. That his retention of this money was had in the *bona fide* belief that he was legally and morally justified in dividing the purchase price of the machine proportionately between the two provisions of the contract, namely, the manufacture and the exhibition flights, seems under all circumstances certain and, but for plaintiff, reasonable. The contract he had turned over to plaintiff required that the machine be not only finished but that he operate it for two successful exhibition flights. Plaintiff's officers and directors would have been justified in making a supplemental contract with him which should provide for an extra payment for the thus risking his life. He could not, however, contracted as he was with plaintiff, assume to pay himself extra for a voluntary service. My conclusion is that while the money so kept belonged to plaintiff and was improperly retained the transaction was in absolute good faith, not fraudulently conceived or carried into effect.

The defendant Cortlandt Field Bishop, at that time president of the Aero Club of America, being interested in the international meeting of aviators and air clubs held annually in France, had persuaded Mr. James Gordon Bennett to offer a prize for aeroplane racing at the meeting in 1909, in the same manner as he had

theretofore offered for balloons.    In the spring of that year and before Mr. Bishop's departure for Europe on April fifteenth, the subject of plaintiff participating with one of its machines in that exhibition and race was brought to the attention of the defendants Curtiss and Baldwin as well as to that of Mr. Herring and, probably, the defendant Wheeler.    It seems to have been by common consent assumed that the defendant Curtiss was the only person connected with plaintiff sufficiently qualified by experience to engage in such an enterprise.    Mr. Curtiss was willing to make the attempt but took the position that for success an entirely different machine than any then in plaintiff's possession would be needed.    Accordingly, that summer, a new, eight-cylinder machine, conforming to Mr. Curtiss' ideas and design, was built and with it he went to Europe, arriving there just in time to participate in the International Meeting at Rheims, France, at which upon August twenty-sixth of that year he won, with the machine in question, the James G. Bennett cup together with a very considerable sum of money which had been offered as a purse.    After this meeting, and at the suggestion of the defendant Bishop, he went to Brescia, Italy, where he engaged in another similar contest and again succeeded in winning quite a sum of money as a reward for his efforts.    The public interest excited by these races, and particularly that at Rheims, was such that Mr. Curtiss, almost over night, sprang into international fame as an aviator, and plaintiff's aeroplanes achieved equal recognition.    He returned to America about September twenty-first, and such was the public interest in him and his machine that both were at once in great demand.    The machine was immediately secured by one of the great department stores in New York, and afterwards by a similar concern in Boston, for exhibition in their stores as an advertising novelty, and plaintiff received as compensation in each instance, for a week's rental, a sum amounting to several times the cost of the machine.    Within the next few weeks Mr. Curtiss made public flights at Governor's Island, N. Y., St. Louis, Mo., and Chicago, Ill., from each of which, except at Chicago, he obtained a sum considerably in excess of his expenses.

Pending all these happenings and beginning with the early summer of 1909, the Wright Brothers, a concern at Dayton, O., likewise engaged in the manufacture, operation and sale of aeroplanes, had been threatening an action against plaintiff, it being claimed by them that the stabilizing devices used by plaintiff constituted an infringement of their patents.    The matter was of such importance and the questions involved so uncertain, that the defendant Bishop as early as May fourth of that year advised

plaintiff through some of its officers of his belief that the Wrights would win their proposed action and that his brother and himself, notwithstanding their large financial interest in plaintiff, would refuse to advance any money for the defense of such a litigation. The action was actually begun against plaintiff and the defendant Glenn H. Curtiss in August of that year, and in the complaint, after the allegations of infringement of the Wright patents, it was alleged that the defendants therein were making, selling, exhibiting and operating aeroplanes and making large profits therefrom; and that said business, and particularly the exhibition business, was and would be a source of great loss and damage to those plaintiffs. Both permanent and temporary injunctions were asked for, with the further demand that this plaintiff account for all profits made from the manufacture, sale or exhibition of its aeroplanes and pay all damages sustained, including treble damages as provided by the United States statutes; and it was also demanded that all infringing aeroplanes be delivered up for destruction. This action became the subject of conference and correspondence between the officers and directors of plaintiff, together with various attorneys and others interested for them. As a result answers were interposed and a contest of the Wright claims vigorously prosecuted. After institution of this suit, the return of Mr. Curtiss from Europe and the flights at Governor's Island, St. Louis and Chicago, and on October 25, 1909, a special meeting of plaintiff's board of directors was had at which all the directors were present. Among other things done at this meeting there was adopted the following resolution, which had been previously prepared by Judge Wheeler:

" *Resolved,* That since the organization of this company that Glenn H. Curtiss has been the manager of the said company, and its business; that it is expressly agreed that he is and shall be employed as the sole manager of the company and its business with authority to designate and employ an assistant manager and fix his compensation, and that

" WHEREAS, the said Glenn H. Curtiss has from time to time, since the organization of this company given exhibition flights in an aeroplane, Now in order that there may be no misunderstanding between him and the company, it is expressly agreed that all trophies, medals, prizes and other compensation which he has earned or received in the past for making such flights is, and shall be, his sole property, and the company lays no claim thereto; and that in view of the fact that such exhibition flights are a valuable advertisement to the company, its business and products, and involves great risk to life and limb,

" *Therefore, it is agreed,* that Curtiss may engage in the business

upon his own account and for his own benefit by making exhibition flights by himself or by any substitute or employee and may also teach and instruct others in the art of aeroplane flying, this company recognizing that in so doing, that the advertisement resulting therefrom is a benefit to the business of the company and will more than compensate for the loss of his immediate services at the offices or plant at Hammondsport, N. Y., and the company recognizes that such acts on his part will be in furtherance to the interests of the said company."

This resolution was adopted by a aye and nay vote and was at the time declared to have been unanimously adopted. Mr. Herring later asserted that neither he nor Mr. Gilbert voted for it but was promptly contradicted by Mr. Gilbert himself, who by letter, written with knowledge that objection to the course mapped out in said resolution had arisen, affirmed the truth of the statement recording him in the affirmative. As to Mr. Herring's recorded aye vote later repudiated by him, even if technically untrue, it is in effect true for there is no question but that when the "noes" were called for he refrained from voting, thereby justifying the declaration of the presiding officer that it had been unanimously adopted. Likewise it does not appear that he at the time disputed such declaration of an unanimous adoption, so that for all practical purposes he must be deemed to have intended to have been recorded in favor of the resolution. That he did in fact vote and vote in the affirmative would seem to be demonstrated by the conversation between him and the defendant Wheeler, at the time, in which he inquired if he could have a like privilege and was informed by Mr. Wheeler, in the presence of his fellow directors that, if he could fly, he might.

Acting upon the authority of this resolution, Mr. Curtiss retained for himself moneys earned by him in the flights theretofore had (some of which were not paid to him until later) and proceeded to arrange for an aeroplane exhibition business which was carried on, by himself and with employees flying under his direction, for something like three years and in which he, as an individual or through the defendant Curtiss Exhibition Company later organized, earned a large sum of money and made a very considerable profit. Two days before the passing of this resolution and in anticipation of its adoption, Mr. Curtiss had entered into an agreement with one Mr. Fancuilli, to manage his interests; same to include the sale, exhibition and exploitation of the Curtiss Aeroplane and any other business which the said Glenn H. Curtiss might direct, and later installed Mr. Fancuilli in plaintiff's office at Hammondsport, where he engaged in the exhibition business

of Mr. Curtiss and at the same time aided, as occasion arose, in the business of plaintiff, his salary being paid, partly by Mr. Curtiss and partly by plaintiff. Shortly after there was adopted for the plaintiff by Mr. Curtiss, Judge Wheeler and Mr. Fancuilli (without formal action of the board of directors) what has been called in the course of this trial " the restrictive contract," which was thenceforth, save in one or two instances where special conditions existed, consistently used in connection with the sale of plaintiff's aeroplanes. The salient part of this contract is as follows:

" * * * that in consideration of the sum for which the said aeroplane is sold and of the good name and reputation of the said Herring-Curtiss Company and of the aforementioned aeroplane, the said purchaser hereby covenants and agrees that the aeroplane herein mentioned will not be used for public flights intended for amusement or advertising purposes, or for any flights which have been previously advertised, or in any contests or races other than open contests or open races held under the auspices of the Aero Club of America or under the auspices of one of the clubs or societies affiliated with the Aero Club of America, provided such races or contests are governed by rules and regulations prescribed by the Federation, International Aeronautic, or the Aero Club of America of New York, N. Y.

" The said purchaser further agrees that the aeroplane herein mentioned will not be taken beyond the boundaries of the United States of America;

" And that the aeroplane herein mentioned will not be used for advertising purposes, except by placing the aeroplane on exhibition, but without operating it on the ground or in the air;

" That the said purchaser will not duplicate or permit to be duplicated any part, or all of the aeroplane herein mentioned and herewith delivered;

" That the aforesaid aeroplane will not be used for making any flights over dangerous ground or through thickly settled areas, or over built up cities, or for making any flights considered more hazardous than the development of the science of aviation warrants; and

" That the said vendor shall not be liable for and shall be free from any and all damages and claims for damages to person or property resulting from the use of said aeroplane either on the ground or in the air. The said vendor hereby agrees to sell to the said purchaser any and all parts for the said aeroplane which may be necessary to repair or maintain the said aeroplane, at regular prices for which such parts are sold by said vendor;

" That it is mutually agreed that the covenants and agreement herein mentioned shall continue in effect to the first day of January, nineteen hundred twelve;

" And that it is further mutually agreed that if said purchaser, or his assigns, shall violate any of the foregoing covenants or conditions, then the title to the said aeroplane shall immediately cease in such purchaser, or his assigns, and revert to said vendor, and said vendor, or its assigns, shall have the right to the immediate possession of the said aeroplane, its fixtures or appurtenances, and may take peaceable possession thereof without claim for damages against it, and shall also have the right, at its option, to enjoin any such violation or violations."

In the course of his exhibition business afterwards conducted defendant Curtiss was permitted to use without money compensation, three at least, and possibly four, of the aeroplanes owned by plaintiff, including that known as the Rheims machine, with which he had won the Bennett cup in August, 1909.

His contracts with certain aviators flying for him, notably that with Charles K. Hamilton, were based upon a percentage of " gate receipts," but instead of providing that the net receipts from the exhibitions should be divided between himself and his employees in certain proportions, recited that there should be paid to him by such employees, as and for rental of the machines so used and which in fact belonged to plaintiff, " sixty percent of the net proceeds of each and every contract for exhibition which shall be fulfilled," together with the additional agreement that all repairs required by the machines should be borne between Mr. Curtiss and his employees in like proportion. The plaintiff takes the position that all of the money received by Mr. Curtiss for his own flights, or from the flights of employees working under him, especially such as purported to have been earned as rental for plaintiff's machines, rightfully belonged to plaintiff; that the resolution of October twenty-fifth was illegal and unauthorized and that the restrictive contract, so called, was devised and put into effect for the express purpose of hampering and limiting plaintiff's legitimate business and for the enrichment, at its expense, of defendant Curtiss; that they were deliberately planned as a part of the fraudulent scheme and conspiracy, having for its object the wrecking, through bankruptcy, of its business; but that even if they were not they nevertheless were in law a fraud upon plaintiff and for this the defendants must respond.

The individual defendants, with the exception of Glenn H. Curtiss and Monroe Wheeler, have been already exonerated from

these charges; as to the latter two it becomes necessary, in order to determine their motives, to consider the situation as it then existed. In passing it should be said that there is no direct evidence that the possibility of plaintiff's insolvency occurred to any one until several months after this time. That portion of the resolution of October twenty-fifth relating to past earnings of Mr. Curtiss had in view the risks he had voluntarily taken and the wide advertising plaintiff and its machines, with the corresponding benefits naturally to be expected, had received therefrom at comparatively little cost to itself. These earnings of Mr. Curtiss in Europe and in the flights at Governor's Island, St. Louis and Chicago are variously stated to amount to $16,200 and $18,150 and can probably only be accurately determined upon a formal accounting. In my view they fall into two distinct classes. Of those derived from the flights at St. Louis, Governor's Island and Chicago, the comment hereinbefore had concerning the moneys retained from the aeronautical machines is pertinent. Mr. Curtiss was under contract to plaintiff whereby his whole time and effort belonged to it. While, as has been said, he could not thereunder be required to make such flights, if he did make them, they were at plaintiff's expense of time and the earnings thereof belonged to plaintiff. This being so, the only question remaining is, have the directors of a corporation power to give away its money to one of their own number whose entire time and effort, by a contract, belong to the corporation? The question answers itself and needs no citation of authority or comment other than my conclusion that, to this extent, at least, the resolution was unauthorized and constituted an improper diversion of plaintiff's assets.

As to the moneys which came from the flights at Rheims, France, and Brescia, Italy, Mr. Curtiss rests his right to keep them for himself upon what he claims was a moving consideration.

This venture was inspired by the defendant Bishop and doubtless appealed to Mr. Curtiss, who had been engaged for a long time in efforts to solve problems of flight with heavier than air machines and had had such measure of success that complete fulfillment of his ambition seemed only just ahead. He was starting out in a business, the success of which might reasonably be deemed an assurance of his future prosperity; he might also have foreseen something of the worldwide fame and reputation which came to him from his success. But that these considerations impelled his action he refuses to say. It is easy to understand the motives which prompted Mr. Bishop who was a very rich man; for the time being aeronautics were his hobby and he wanted to see his country, his club and his company foremost in the new science. With him

money was not an object to be considered; to be identified with success in the new sport was sufficient glory; sufficient compensation. The others approached the enterprise with interest in its success as an abstract scientific and sporting proposition but they also kept in sight the possibilities of great pecuniary advantages which might flow from success.

Mr. Curtiss was the only person upon whom they could call to make the flight for them, and while his interest and courage had been fully demonstrated, he still might not care to risk his life when not obliged to. Out of the discussions upon the subject Mr. Curtiss was led to understand that if he would enter the contest with one of plaintiff's machines, in event of defeat Mr. Bishop would pay all his expenses, and if he won the race the expenses should be paid from the prize money and the balance thereof, if any, should belong to him.

Defendant Baldwin testified that Mr. Bishop made that proposal to Mr. Herring and himself, and that he in turn communicated it to Mr. Curtiss as an inducement for him to accede to Mr. Bishop's desire that plaintiff should be represented at the meeting. Both Mr. Bishop and Mr. Herring deny this statement, except in so far as it relates to the payment of the expenses by Mr. Bishop, but that there was some talk upon the subject from which Mr. Curtiss and some of the others understood the possible financial gain was agreed to go to Mr. Curtiss individually, in recompense for his risk and effort, seems proven beyond peradventure  It cannot be said that his interest in plaintiff and aviation generally would have led Mr. Curtiss to make the attempt without such inducing promise, for it was, as be believed, one of the conditions under which he was to make the attempt. Having performed his part of the venture and thereby brought plaintiff as well as himself to the favorable notice of all nations and peoples interested in the subject of air navigation, he could naturally expect the reward promised him.

Whatever the arrangement was, it was of course unofficial; the directors, as individuals, could not legally bind plaintiff to such a contract. But having led him to act upon such an understanding to the great advantage of plaintiff, they might, as I see it, lawfully ratify their informal action in the manner now complained of, and that such ratifying resolution was unanimously adopted satisfies me thoroughly that the promise was made to Mr. Curtiss and was so understood by all.

The Rheims and Brescia moneys were rightfully his and no fraud can be spelled out of his retention of them.

The disposition of the allegations based upon that portion of the

resolution relating to future exhibitions by Mr. Curtiss, and the putting into effect of the so-called restrictive contract, presents an entirely different question and one which can only be determined in the light of the circumstances in which this board of directors then found their company and themselves. This is particularly true when it is considered that, while at the time the directors were apparently unanimous in their action, there has since come to pass a conflict of statement as to what actually happened when the resolution was adopted and as to the underlying motive prompting it. It is impossible to form a true judgment of those motives and actions by only considering present appearances. The suit of the Wright Company had been brought shortly before, and the directors were united in the thought that it ought to be contested. Apparently they all believed it was not well founded, but the possibility of defeat (which was ultimately the outcome), with the consequent liability to plaintiff, required careful consideration, to the end that, so far as possible to avoid, nothing be done or omitted which would increase the damages plaintiff might ultimately be called upon to pay. The action was in equity. The demands of the bill of complaint were broad and far reaching. Not only might a permanent injunction completely restraining plaintiff from the manufacture, sale and use of aeroplanes and from aeroplane exhibition be had, but it might be required to pay over to the Wrights all its profits gained therefrom, including those derived from the earnings of employed aviators or from rentals paid by them for these machines. Further than this, if the Wright Brothers succeeded, they might likewise recover against every purchaser of plaintiff's machines his profit earned therewith and in addition obtain against him a similar permanent injunction. Every purchaser holding plaintiff's guaranty could, in that event, recover against plaintiff for the value of his machine so lost and the profits he was compelled to pay the Wright Brothers together with the costs which he had incurred. There was a still further liability of plaintiff for all damages sustained by the Wrights by loss of sales and from the loss of exhibitions, caused either by this plaintiff or its vendees, which losses, in case the prerequisite fact set forth in the United States statutes could be proven, would also lead to a recovery for treble damages. U. S. R. S. §§ 4919–4921. There was also before the directors the serious question whether, in addition, they themselves would not become liable for the damages sustained by the Wrights in event the defense of the infringement action proved unsuccessful. 22 Am. & Eng. Ency. of Law, 483.

A motion for an injunction was then pending in the Wright action

which motion was later granted and its operation only stayed by the giving of a bond in the sum of $10,000 as security against the intervening damage. Ultimately the order for that temporary injunction was reversed upon appeal but the dangers of the situation are sufficiently indicated by the fact that a court with jurisdiction reached the conclusion that an order of that character was justified under the facts. At this time plaintiff had several machines either completed or in the process of manufacture; the Aeronautical Society machine had been actually sold. The Warner machine (No. 3) and the Plew machine (No. 4) had been contracted for but not delivered, both of these machines having been sold by Mr. Herring or under his direction without limitation as to plaintiff's liability for damages from their use. Continuation of its aeroplane business by plaintiff, under such circumstances, manifestly could only be had at the risk of the company's ruin and, with the exception of Mr. Herring, its directors were apparently convinced that, for the time being, its activities should be so limited as to minimize to the fullest extent any money recovery against it in the Wright suit. So far as the exhibition branch of the business was concerned, if we are to judge by his attitude in the meeting of October twenty-fifth, Mr. Herring fully concurred with that decision, but apparently believed that the manufacture and sale of the machines to outside parties should be continued, for shortly thereafter he contracted for the sale of a machine with full knowledge that its purchaser was buying it for exhibition use by a professional aviator. His knowledge of the policy of his fellow directors concerning sales of this character is manifest by his attempt to conceal the facts, for in reporting the sale, he not only kept from them knowledge of the designed use of the machine, but gave to them a fictitious name as that of the purchaser. It is stated, and I think the proofs warrant the conclusion, that the purchaser, for reasons personal to herself, desired not to be known in the transaction and that the use of the fictitious name was had at her request. The transaction, however, was with plaintiff and there was no legitimate reason why its managing officers should not have been made acquainted with the facts, and not left to learn them from others as they shortly did. These, together with various other happenings since the beginning of the Wright suit, unquestionably excited in the minds of the other directors apprehension of future difficulty, and because of his failure to see the dangers to plaintiff, led directly to the adoption of the so-called restrictive contract. This contract undoubtedly militated against the sale of aeroplanes, although it did not entirely bring them to an end. Such an outcome must have been, of

course, foreseen and was evidently accepted as the lesser evil; the genuine intention to sell when plaintiff safely could being evidenced by the fact that in two instances where same could be done without serious danger, its stringent provisions were somewhat modified.

Returning to the resolution itself, there remains to be considered the permission to engage in the exhibition business on his own account therein given to defendant Curtiss. The resolution recognizes upon its face that the exhibition business was ordinarily within the scope of plaintiff's operations and that Mr. Curtiss was under a contract with the company which gave to it the entire proceeds of his time and business effort. His years of study and experiment had culminated in practically a worldwide recognition of his ability as a designer, manufacturer and operator of aeroplanes. He and his company stood before the world as among the greatest in the art; then came this litigation, with its possible outcome of entire loss of the pecuniary reward which was expected to flow from that recognition. Plaintiff could not fly its machines nor permit any other person, in whose responsibility and discretion it had not the utmost confidence, to do so. To drop the business where it was and withdraw its machines and Mr. Curtiss from the public eye would be simply to lose all the benefits of the advertising and publicity which had been had. Mr. Curtiss was willing for himself to do that which plaintiff could not safely do and take his chances as to the outcome of the Wright suit. The directors, trusting him implicity, saw that by so doing he and plaintiff's machines, which had inevitably come to be known by his name alone, would be kept before the public until the time came, if it ever did, when the company might safely enter upon the exhibition business for itself. I can see no way other than by the plan adopted by which plaintiff could have retained for itself any benefit from the renown that had come to it and believe that the judgment of the directors was both honest and good; that the arrangement had been talked over in advance between those of the directors who were at Hammondsport, and with Mr. Fancuilli, in no manner tends to weaken my conclusion. They were not only directors but were officers of the corporation; it is common knowledge and experience that formal action by boards of directors is almost invariably taken after previous discussion and consideration between some of its members. The only way in which such a plan could be carried out was by the release of Mr. Curtiss from the restrictions of his contract with plaintiff; otherwise the proposed action would fail of its object, for the right of Mr. Curtiss to retain for himself his earnings would then depend upon the chances of a legal construction that the permission, *ipso facto*, operated as a modification

of his contract. If the company was to be protected, nothing could be left to chance. In his capacity of vice-president, Mr. Curtiss had, from the beginning, been practically the general manager of the company in all matters except as to certain selling activities of Mr. Herring. The resolution, in terms, made him general manager and allowed him to appoint an assistant, thus leaving him free to divide his time between the company's affairs and the exhibition business as the exigencies of either from time to time might demand. The anticipated benefit from the advertising, certain to follow his exhibitions, would beyond question more than compensate for any of his time thus taken away from plaintiff and its affairs. That his contract had entered into and been a part of the consideration for which the stock of plaintiff was issued is not overlooked, but its modification was in such manner as to occasion no loss to plaintiff or its stockholders, but upon the contrary insured them a direct benefit, and was not improper. In connection with the argument now advanced by plaintiff it is interesting to note that Mr. Herring, Mr. Gilbert, as agent for Mr. Bishop, and Mr. Curtiss owned an overwhelming majority of plaintiff's capital stock; that they with Mr. Wheeler, who was a small stockholder, and Mr. Baldwin (who had no financial interest in the company but was a man of wide observation and experience) agreed in adopting what seemed to them to be, and in the light of the then surroundings, to me now appears to have been, a move which would preserve for plaintiff all that it could by any safe proceeding hope to preserve of the benefits of Mr. Curtiss' summer's work.

It is but natural that this resolution and the restrictive contract should now be relied on as proof of a general fraudulent purpose and that the steps taken thereunder to protect plaintiff against the dangers involved in its then situation should be urged against defendants as indicating an improper and unlawful intent. I am, however, well satisfied that these decisions and the things done in accordance therewith, some by direct action of the board of directors and others in the exercise of the discretion of the managing officers, were wise and proper business precautions and that had the directors failed to take these or other similar precautions, they could well have been charged with neglect of their official duty. From this conclusion it follows that no fraudulent purpose or unlawful intent is to be spelled out of these acts of plaintiff officers and directors, or any of them.

It has already been seen that in his previous exhibitions the defendant Curtiss used the eight-cylinder Rheims machine together with two and possibly three, four-cylinder machines, without direct

compensation therefor to plaintiff; these he continued to use until after plaintiff's bankruptcy in the spring of 1910. Apparently he also at times used certain other machines later sold and delivered to customers. Just what the consideration was for the use of these by Mr. Curtiss, either prior to or after the adoption of that resolution, does not appear. My attention has not been called to any entry in plaintiff's books showing a cash payment of rental therefor and I assume they were used by him in pursuance of a general understanding that the company was well compensated by the widespread notoriety and advertising which the exhibition venture of Mr. Curtiss brought to it and its machines. The machines were kept in repair and were ultimately, as will be seen, sold and the proceeds used for the benefit of plaintiff. They would otherwise have remained idle and, in the absence of any proof to the contrary, I must find, as I believe the fact to be, that the action of plaintiff's officers was well meant and redounded to the benefit of plaintiff. Various professional aviators were, from time to time, employed by Mr. Curtiss, flying in various parts of the country with these machines, as did also, at times, Mr. Curtiss himself. With one of them, Charles K. Hamilton, he had made two contracts; one dated November 5, 1909, and the other November 17, 1909. The first of these provided that, in consideration of the opportunity given him through the use of an aeroplane provided by the said Curtiss, he should pay to Curtiss sixty per cent of the net proceeds of each and every contract fulfilled by him. The second was intended to supersede that of November fifth and was like it in all essentials except that the payment of sixty per cent of the net proceeds was expressed to be as rent for the use of the said aeroplane. The change in the form of the contract was an evident attempt to relieve Mr. Curtiss from any personal liability for the acts of Hamilton, whose early promise was borne out by his subsequent reputation as a venturesome, if not a reckless flyer. In essence, however, the relations of the two were that of master and servant. The contracts with aviators other than Hamilton were all in the rental form of that of March seventeenth and the same claims are made by plaintiff as to their legal effect upon the payments made to Mr. Curtiss thereunder. When all the surroundings are considered, any claim, either then or now, that moneys received by Mr. Curtiss from such flights, whether on the theory that the moneys were earned with plaintiff's machines or were rentals received by Curtiss for the use of plaintiff's machines, is untenable. To sustain a claim of that character would be to hold that, while Mr. Curtiss was in the exhibition business upon his own account with the consent of plaintiff, he was to be excluded

from participation in its earnings. The mere fact that plaintiff permitted him to use its machines, when the same would not have otherwise earned either reputation or money for plaintiff, warrants no such conclusion.

February 12, 1910, at a meeting of the directors, attended by defendants Curtiss, Wheeler and Baldwin, the following resolution was adopted:

" *Resolved,* That Mr. Curtiss be authorized to sell the Rheims aeroplane, and the two aeroplanes which were sent to Los Angeles, at the best prices obtainable, and apply the proceeds, up to ten thousand dollars, to secure the American Surety Company upon its bonds given in the suit in the United States Court of *Wright Company* v. *Herring-Curtiss Company and Curtiss,* and the surplus of such sales to turn over to such company."

Reference has been made to the temporary injunction order procured by the Wrights. The defendants in that action, to stay the operation of the injunction, gave a bond of $10,000, the surety company issuing it being secured against loss by certain securities, owned by the defendant Curtiss individually, pledged by him with it for that purpose. The intention of the resolution just recited was to continue such $10,000 bond, but thereafter securing the surety company by the proceeds of the sale of these machines instead of by Mr. Curtiss' individually owned securities.

Following the adoption of that resolution an arrangement was made between Curtiss and Hamilton whereby these machines were pretended to be sold to Mr. Hamilton for the sum of $10,000, same being paid for by his check for seven thousand odd dollars, but which really represented Mr. Curtiss' sixty per cent of the proceeds of certain of Hamilton's exhibitions, together with Mr. Curtiss' personal check for a little under $3,000. This transaction was a pure subterfuge. Mr. Curtiss was the real purchaser and his ownership was later confirmed by a bill of sale executed to him from Hamilton, which states it was given to confirm Mr. Curtiss' title to the machines. Apparently none of the parties in this action, except Mr. Curtiss, knew anything about that transaction until long after its happening. Plaintiff received the $10,000; it was used for the purpose contemplated in the resolution and later, when the bond was canceled, came into the hands of the receiver in bankruptcy and was reported as an asset and considered with plaintiff's other properties when the adjudication of bankruptcy was made.

Whether this transaction was so intended or not it was a fraud upon plaintiff. Mr. Curtiss had suggested to Judge Wheeler his willingness to buy the machines and been advised by him that his position in the company precluded his doing so and the method

adopted was in defiance of Judge Wheeler's advice and was a deliberate attempt to obtain by indirection what could not safely be obtained openly and above board.

It will be observed that the resolution did not provide that the machines should be sold for $10,000. Its form indicates the belief of the directors that the machines were worth, and would probably bring, more than that amount; as a matter of fact they were worth more and Mr. Curtiss must be held responsible for the outside price for which they could have been sold. While there is some proof of irregularly increased prices being quoted to prospective customers, prices for actual sales were at this time established by plaintiff at $5,000 for the eight-cylinder and $4,000 for the four-cylinder machines. These prices were usually subject to a deduction for the selling agent's commission of twenty per cent and, even after such deduction, netted a satisfactory profit for plaintiff. There was no commission here to be deducted but, nevertheless, I believe that Mr. Curtiss must be charged the regular sale price and held to have, by this transaction, defrauded plaintiff of the sum of $3,000.

Coming to the law suits and injunctions which were begun and procured by Mr. Herring against the defendants Wheeler, Curtiss, Baldwin and others, and those begun by the Herring-Curtiss Company against Mr. Herring in the latter part of December, 1909, an understanding of their nature and effect must largely depend upon knowledge of the facts which preceded the organization of the company, as well as the basis upon which it was finally organized. This includes, necessarily, something of the early history of Mr. Curtiss and Mr. Herring who were its chief promoters.

To what has already been said of the former it is only needful to add that without the aid of money or more than a common school education, he had through his own efforts, by sheer native ability and energetic purpose, become the head of a successful and quite extensive manufacturing business, and at the same time a trusted associate of men interested in aeronautics, many of whom were well known as reputable scientists and inventors. He had achieved much practical success with heavier than air machines and was the discoverer of various principles and devices which were useful in overcoming the obstacles to flights with such machines and had made with machines of his own planning many of the pioneer flights in this country.

Mr. Herring had spent the greater part of his mature life, after leaving college where he had taken advanced courses in engineering, in scientific work and mechanical investigations. From about the year 1892 he had individually, and in association with others,

among whom were Octave Chanute, Samuel P. Langley and Sir Hiram Maxim, planned and experimented with various kinds of flying machines and written for publication in newspapers and scientific journals and magazines various articles on the subject of aviation and aerodyamics. He had become well known to many of the foremost investigators of such subjects and seemingly bore among them a good reputation both personal and as a scientific investigator. In the year 1897 he with Mr. Chanute had obtained a patent for certain of their plans and devices from the English government but, as far as appears, had never attempted to build and operate flying machines upon such patent nor did the device come into actual use. No machines other than those for experimental use had been built by him down to February, 1908, when he obtained a contract to construct an aeroplane for the United States government. This machine was never completed and the contract was finally, after several extensions, canceled by the government. He was a member of the Aero Club of America and a frequenter of its headquarters in the city of New York, in which city in the years 1908 and 1909 he operated a shop equipped with tools and machinery used in connection with his line of work. He had earlier become acquainted with defendants Bishop, Curtiss and Baldwin, who were also members of the Aero Club of America, and was somewhat familiar with the work and experiments, along the lines in which he was interested, of the latter two as well as with the results being obtained from the investigations of the Aerial Experiment Association. In the month of February, 1909, he opened negotiations with the defendant Curtiss for the purchase of his real property at Hammondsport, N. Y., and the business of the G. H. Curtiss Manufacturing Company, conducted thereon, together with the various patents and inventions, aeronautical and otherwise, of Mr. Curtiss, for the purpose of erecting a new company for the manufacture, operation and sale of motorcycles, aeroplanes, motorcycle and aeroplane motors and such other things as would be naturally connected with that business, in which new corporation both Mr. Curtiss and himself were to be stockholders and find employment congenial to their tastes and along the line of their previous work. At about the same time he opened negotiations with the defendant Bishop, who was the president of the Aero Club of America and accordingly interested in the development of flying machines, for the financing of the proposed new organization. In these negotiations he stated to both the defendants Bishop and Curtiss, as well as to the defendant Baldwin, who was friendly with all parties, that he then had pending in the United States Patent Office some fifty-one claims for patents

upon inventions of his for devices to be used upon aeroplanes and dirigible balloons, as well as other inventions for the same purpose, for which applications had not been filed.    These inventions together with all the jigs required for their manufacture and completion, other than those relating exclusively to so-called toy constructions, he offered and agreed to assign to the company so about to be formed.    These together with the real estate and the plant, stock in trade, business and good will of the G. H. Curtiss Manufacturing Company, which he expected to buy from the defendant Curtiss, were to become the property of the new corporation (plaintiff) in exchange for its entire capital stock to be issued to him.    From the negotiations with the defendant Bishop came an agreement by Mr. Bishop to advance to him, in exchange for certain stock when issued, in the new company $30,000; as a matter of fact Mr. Bishop did procure to be advanced to him $37,000, $20,000 of which was his personal contribution, $16,000 was contributed by his brother, David Bishop, and $1,000 by a friend named James M. Deering.    The negotiations with the defendant Curtiss culminated upon March 9, 1909, in a contract wherein it was agreed that in consideration of the sum of $55,000 defendant Curtiss should sell and deliver to Mr. Herring all his real estate in the village of Hammondsport, N. Y., upon which was situated his dwelling house and the factory buildings of the G. H. Curtiss Manufacturing Company, together with all the assets and property of that company other than bills and accounts receivable in existence at six o'clock P. M. on the 8th day of March, 1909.    The sale included two aerodromes, located upon rented property, together with all the good will of the G. H. Curtiss Manufacturing company and all patents and inventions in which he might have patentable rights, then owned by Mr. Curtiss.    Mr. Herring agreed that he would organize, with such property, a new corporation, along the lines submitted to the defendant Bishop, of the capital stock of which there should be issued to Mr. Curtiss 160 shares of preferred and 400 shares of common.    The contract also provided that Mr. Curtiss should be either a director and an officer or manager of said company for three years at a salary of $5,000 per year, during which time any and all inventions made by him touching the development and improvement of any article which the company should manufacture or sell should belong to and be assigned to the company.    Mr. Curtiss agreed to transfer all this property free and clear from lien or incumbrance and to pay all the outstanding bills and accounts of the G. H. Curtiss Manufacturing Company except $5,000 in notes owned by the Bank of Hammondsport, which were to be paid by said Herring

as a part of the $55,000 consideration spoken of. Later a supplemental agreement was made, whereby it was agreed that if the inventory of Mr. Curtiss' assets showed a value of more than $62,000, the company should pay him an additional $5,000 by August 1, 1909. This contract was carried into effect, the deeds and transfers made and the company, which is the present plaintiff, formed as agreed. A firm of public accountants, doing business under the name of the Standard Audit Company, was at once employed by plaintiff to make an investigation of its assets and open for it necessary books of accounts. This investigation was had entirely independent of and without any suggestion from Mr. Curtiss, except as he may have voted aye at the meeting at which it was authorized. The report fixed the total value of the properties so turned over by Mr. Curtiss to be $82,272.11 and the additional credit to Mr. Curtiss, under the supplemental contract, of $5,000, was accordingly made upon the books of plaintiff and the money was later drawn out by him. The difference between the stated value of the properties and the $60,000 he so received for them represented the value actually paid by Mr. Curtiss for the common and preferred stock which was later transferred to him by Mr. Herring. At the most this can be said to be reduced only by the $3,700.58 hereinbefore discussed which had been advanced by customers on orders for motorcycles. When the company was organized Mr. Herring advanced $600 cash for the stock which was issued to the acting incorporators, and for the remainder of the $360,000 of stock conveyed and assigned to plaintiff the property obtained from Mr. Curtiss together with the fifty-one claims theretofore filed by him in the Patent Office at Washington, also all discoveries and inventions of his for which applications had not yet been filed, excluding, however, from the transfer the English patent spoken of, and the machine he was building for the United States government together with his contract therefor. Of this stock he caused to be transferred to Arthur W. Gilbert 631 shares, in payment for the $36,000 he obtained from the defendant Bishop and his brother, and to Mr. Deering 12 shares for the $1,000 he had received from him. From this $37,000 he paid to the defendant Curtiss $30,000 still due under their contract and he also caused to be transferred to him personally or, at his instance, to certain persons who had been small stockholders in the Curtiss Manufacturing Company, 683 shares of stock. Later he sold for cash small amounts of stock and from such sales together with the balance of the moneys received from Mr. Bishop and Mr. Deering reimbursed himself for all the money he himself had invested in the corporation except about $8,000 which was the outside cash investment made by him. A little later

he paid from plaintiff's funds an individual obligation of his own for $442, and, again later, overdrew his own salary account to the amount of $1,400, thereby reducing his actual investment to $7,100 or thereabouts. In his contract Mr. Herring had agreed to also furnish plaintiff with working capital sufficient for its needs. Relying upon that agreement, plaintiff's officers erected new buildings, purchased new equipment and planned generally for the anticipated large business, all at a very great expense, but nothing further than this $7,100 was ever paid in by Mr. Herring. As a matter of fact I think he did not originally turn into the company more than $7,500, deducting from which the $1,842 he afterwards improperly paid out and withdrew, left his total investment in redemption of his promise to furnish sufficient working capital but $5,658, which, mildly speaking, is a conservative amount of working capital for a $360,000 corporation. By the supplemental agreement with Mr. Curtiss the latter was, in case the inventory exceeded $62,000, to receive $5,000 additional consideration for the sale of this property. This additional $5,000 was a part of the purchase price to be paid him by Mr. Herring personally but was charged against the plaintiff corporation so that on December 18, 1909, Mr. Herring actually had furnished toward plaintiff's capital needs not more than $2,100 in actual cash and, according to my computation, only $650.

The inventions and discoveries of both Mr. Curtiss and himself, together with the fifty-one patent claims, were assigned by him to plaintiff in general terms by an instrument competent to carry their equitable title but which did not conform to the requirements of the United States Patent Office and was insufficient to enable plaintiff to obtain from such office any information concerning them or to procure their transfer to plaintiff in the Patent Office record. As a part of the entire transaction Mr. Herring procured to be executed with the company, by Mr. Curtiss, the three years' contract above mentioned and also himself entered into a contract with it practically the same as was that of Mr. Curtiss' except that he was to devote only two-thirds of his time to the company's affairs while Mr. Curtiss was to give them his entire time and attention. Both Mr. Herring and Mr. Curtiss were elected vice-presidents of the company, Mr. Herring remaining most of the time in New York while Mr. Curtiss took active and immediate charge of the Hammondsport factories and its business. Under this arrangement, while the company had no assignment of the discoveries and inventions of Mr. Curtiss which it could enforce before the Patent Office, it had the actual use and enjoyment of them by Mr. Curtiss himself who continued for plaintiff the work

in which he had previously been engaged and devoted to it all the information and the acknowledged skill he possessed. As to the discoveries and inventions of Mr. Herring, all knowledge of them, so far as plaintiff was concerned, was locked within Mr. Herring's breast. Information concerning them was, from time to time, sought by Mr. Curtiss and others connected with plaintiff's affairs but was always refused by Mr. Herring, who put off the requests for information with the plea that, if divulged by him, the information might come to outsiders and the company lose the benefits. Both then and upon this trial he claimed to act in that regard upon the advice of competent attorneys. The answer to the proposition plainly is, that it was none of his affair. All those inventions and applications were owned by plaintiff; the responsibility was its and his only duty was to carry out his contract.

At the organization meeting it had been

"*Resolved,* That the president [the defendant Wheeler] consider and take steps for the assignment to the company of all the patent rights, inventions, etc., etc., of said Augustus M. Herring in accordance with his contract with the company."
and efforts to obtain the assignments, or any knowledge concerning them, having failed, the board of directors, at the meeting held October 25, 1909, adopted a resolution as follows:

"*Resolved,* That Mr. Herring assign, transfer and set over to this company all his inventions, devices * * * patents and applications for patents * * * and that he furnish the secretary with a list of the inventions, devices and improvements mentioned in his contract and the number of applications or patents pending the same."

And at the same time

"*Resolved,* That Mr. Herring turn over to the company all the patents, patentable rights and inventions which G. H. Curtiss assigned to him and which said Herring agreed to assign to the company."

Mr. Herring was present at this meeting and voted for both resolutions but paid no further attention to the matter, never assigned same and never divulged to any one connected with the company any knowledge or information as to his own inventions and patent applications until long after the adjudication in bankruptcy and, so far as defendants know, not until the summer of 1921, when upon this trial certified copies of the patent applications were finally produced by counsel. It then transpired that while there had been some changes and subdivisions of the original applications, not necessary to here consider, almost all of them were for discoveries and inventions made by other students and investigators. The,

witness Drumm, a patent attorney of standing and reputation, formerly employed by Mr. Herring, testified for plaintiff that only six of the fifty-one claims were valid in Mr. Herring, while at a later stage of the trial it was claimed by plaintiff's counsel that in the changed applications there were thirteen which the government Patent Office would allow as original in him. It is of little consequence whether there were six or thirteen concerning which his claim of original discovery was truthful, for even those do not seem to have been of sufficient importance to make further action concerning them worth while, for nothing had been done by him with them beyond the filing of the claims. The mental attitude which led Mr. Herring to file, as his own, claims for discoveries mostly belonging to other people can be easily understood by a careful reading of his testimony given upon the trial concerning himself, his work and his accomplishments. After plaintiff began business various suggestions as to the construction of motors, motorcycles and aeroplanes were made to Mr. Curtiss and other people connected with the management of the factory by Mr. Herring. In most cases they involved nothing about which Mr. Curtiss was not already well informed; some were adopted and tried out for a while and then abandoned, while others were ignored entirely, and Mr. Curtiss early in the summer, and before his trip to Europe, became convinced, and expressed his conviction to others connected with the business, that Mr. Herring had brought nothing of value to it. Partially because of these matters and partially because of Mr. Herring's captious spirit and fault-finding disposition, difficulties grew up between him and Mr. Curtiss. As an outcome of this internal dissention, and of plaintiff's directors' well-founded belief that Mr. Herring had contributed nothing to plaintiff's welfare but had obtained a large majority of all its stock practically for nothing, it was decided at the directors' meeting of December 18, 1909, to begin an action against him, in behalf of the company, for the surrender and cancellation of his stock and for an accounting for the proceeds of that he had sold. The annual meeting of the company was coming on, to be held in the January after this meeting, and the practical certainty that it was Mr. Herring's intention then, through his control of a majority of plaintiff's stock, to take over the company, doubtless had something to do with the instituting of the suit at that time, for the directors unquestionably believed such a change would not only be disastrous to the company itself, but a genuine injury to progress in the art of aviation, a fear that was well founded. That the action was brought for the purpose of improperly " freezing " Mr. Herring out of the company and as a part of a fraudulent purpose to ruin

the company itself is not sustained by the evidential facts produced. In these later days the method by which Mr. Herring organized the company and secured control of its large property assets together with its probable profits is somewhat slightingly spoken of as "high finance" and, in their effort to protect those interested in the company's welfare against the probable results of his actions, the directors of plaintiff used sound business judgment and should be upheld instead of criticised therefor. Before leaving the subject of lawsuits, mention should again be made that, at practically the time of the commencement of this action against Mr. Herring, he, himself, had begun what is known as a stockholder's action against the defendants Wheeler, Curtiss and others, based upon many of the same charges of fraud which are put forward as a foundation for this action, asking to recover for the company and its stockholders the losses which he claimed it had sustained by their management of its affairs. The attack upon plaintiff by the Wright Company had been published in the press far and wide, and these internal litigations were likewise deemed of public interest by the press which gave them extensive notice, together with a considerable amount of detailed information as to the charges laid against each of the contending factions by the other, with the result that plaintiff suffered greatly from this additional, unpleasant and detrimental publicity.

Upon the 19th day of July, 1909, Mr. Curtiss, one C. Leonard Waters and his wife, Elizabeth H. Waters, together made and executed a certificate of incorporation of the Marvel Motorcycle Company which was shortly afterward filed and recorded in the office of the secretary of the state of New York and the office of the clerk of Steuben county, respectively. This corporation was organized with a capital stock of $50,000, consisting of 250 shares of preferred and 250 shares of common stock. Of this there was issued to Mr. Curtiss 75 shares of preferred and to Mr. Waters 75 shares of preferred and 249 of common stock and to Mrs. Waters, 1 share of common stock. All this stock, both common and preferred, had equal voting rights and the company began its business with $15,000 paid in capital, of which Mr. Curtiss and Mr. Waters each contributed $7,500. Mr. Waters had been in the motorcycle business for a number of years, both in Buffalo and in Hammondsport, and for some time before the forming of this company had been manufacturing, assembling and selling a motorcycle which he called the Erie Motorcycle, the motors for which he had purchased from the Reliance Motorcycle Company of Addison, N. Y. These motors were of two sizes, the larger of which carried upon

49

Supreme Court, May, 1923.        [Vol. 120

it the name " Reliance Motor." The organization of this new motorcycle company had, of course, been discussed with Mr. Curtiss and was by him called to the attention of Mr. Herring and presumably to that of Mr. Wheeler and Mr. Baldwin as well. It was planned to utilize, for the factory of the new concern, a small portion of plaintiff's land and to erect thereon the necessary building or buildings, the land to be sold to it by plaintiff for $200. Upon July 29, 1909, the defendant Curtiss wrote to Mr. Herring in substance that Mr. Waters had already begun building upon the land but wanted to get a deed before going much further and also advised Mr. Herring that the motorcycle corporation had been formed and that he was acting as one of its incorporators and directors. The letter also contained the information that a notice for a special meeting of plaintiff's directors to be held at Mr. Gilbert's office in New York, August third at ten o'clock A. M., was being sent out. It was the intention that this new corporation should work in harmony with plaintiff, and purchase from plaintiff a considerable portion of its manufacturing material, and in this same letter Mr. Curtiss also stated that plaintiff was making plans to build for it 400 or 500 motors in addition to those which it expected to put out for its own trade. The special meeting of the board of directors mentioned in the letter to Mr. Herring was, in fact, held at the Hotel Astor in the city of New York instead of at the office of Mr. Gilbert. It was attended by Mr. Herring, who presided, and Mr. Curtiss and Mr. Baldwin and waivers, with consent for the proposed conveyance to the Marvel Company, from Mr. Wheeler and Mr. Gilbert were filed. A resolution authorizing the conveyance was adopted and later the deed was executed and delivered and the Marvel Company took possession. During that summer its building was completed and equipped, a considerable amount of the material which entered into it, as well as some of the labor, being furnished by plaintiff and for which plaintiff was in due course of time paid in full. In the meantime plaintiff, in connection with its own business expectations, had arranged for and to some extent placed increased orders for materials, having in view this additional need, thus to some extent anticipating its business relations with the new company. That summer and fall plaintiff, under Mr. Curtiss' direction and supervision and under the immediate direction of its shop superintendent, the defendant Kleckler, devised a new and improved motorcycle motor which was called Model G, and for which a very large sale both by plaintiff and the Marvel Motorcycle Company seems to have been anticipated. Following this and on December 2, 1909, a contract was made between the two companies, whereby plaintiff agreed to furnish and deliver 500 completely

assembled Model G motors of 1910 design for the sum of $35 per motor, or, in lieu thereof, the parts for 500 such motors complete and ready to assemble for the sum of $30 per motor, it being also agreed that 300 of the 500 so arranged for should be finished prior to March 1, 1910, and the balance prior to June 1, 1910; there was also a stipulation in the contract that either party failing to perform its agreement should pay to the other the sum of $1,000 as liquidated damages. There can be no dispute but that the engagements with the Marvel Motorcycle Company and particularly the obligations assumed by reason of the contract just mentioned, entered largely into the condition of insolvency in which plaintiff subsequently found itself. The underlying cause of the insolvency came, however, from other and previous conditions. The bearing of these Marvel Company affairs upon the insolvency was, nevertheless, so intimate that plaintiff now earnestly argues that it was an unusual and improvident transaction upon the part of Mr. Curtiss and those associated with him; that it was conceived in the brain of some of them and deliberately worked out as one of the steps whereby the intended ruin of plaintiff was to be achieved. That it was an unusual contract is thoroughly disproved, for similar relations between business concerns engaged in the manufacture and sale of motorcycles are largely adopted and followed. That it was in and of itself an improvident contract is, I am satisfied, likewise untrue and that it was entered into with due care for its effect upon plaintiff is well established. When the matter was under advisement Mr. Curtiss submitted it to Mr. Genung, who was in general charge, under him, of the business and of plaintiff's affairs who, after consultation with Mr. Curtiss, Mr. Kleckler and others in responsible position with plaintiff, and in collaboration with plaintiff's purchasing department and accounting department, reached the conclusion that the motors could be sold at the price mentioned with a good margin of profit for the plaintiff. As the business could be handled without appreciable increase of overhead cost, and opening, as it did, avenues for increased output of plaintiff's product, the proposition was thought wise from a business standpoint. The probable cost of the motors was carefully figured by men who were acquainted with all the surrounding conditions and of whose loyalty and desire for the company's prosperity there is, so far as can be discovered, no room for doubt. Mr. Curtiss, relying upon their judgment as to costs, made the contract. Plaintiff has called a couple of witnesses who, now after the expiration of more than ten years, assume to say that these selling prices carried with them actual loss. One of these conclusions is reached by an addition of such prices as can now be ascertained plus an estimate

of prices as to parts for which there is now no data, plus an estimate for overhead. The other is by a bookkeeper witness who attempts to say what the prices should have been, by some process of deduction derived from what remains of plaintiff's accounts. Neither of these estimates of cost is entitled to weight as against facts that are well established.

So far as the motorcycles themselves were concerned, each company was to complete its own after its own plans and ideas. The Herring-Curtiss Company did not intend to make the motors but planned to buy the parts and either assemble them or, if the Marvel Company so elected, to deliver them unassembled. Plaintiff expected to use 1,000 motors while the Marvel Company contracted to take 500 additional. The motors had been designed, all the experimental work was done, there was no added expense for testing and patterns. Genung and Kleckler learned that by ordering 1,500 sets, instead of 1,000 sets, there would be a very substantial reduction in the price of both the 500 and the 1,000 sets desired for their own use. The cost of labor and material was estimated at from twenty-six to twenty-seven dollars per set with no increase of overhead because of the 500 extra motors entering into it because there was in fact no such appreciable increase. Had plaintiff been making the motors itself a different question would have been presented, but as a matter of fact, all that plaintiff had to do was to order 1,500 sets instead of 1,000, assemble 500 of them or not as might be desired, the difference in prices charged caring for that labor, and turn them over to its purchaser. Plaintiff's officers were bound to deal, not only in good faith but, in view of the relations of Mr. Curtiss to the other company, with the highest degree of good faith in that matter. They are not, however, bound to account for honest errors in judgment, if it should be held that such errors were made. In and of itself the contract was a honest contract, a provident contract and a profitable contract and, but for other troubles which came to pass, those who entered into it would doubtless have received commendation instead of the excoriation now visited upon them.

Up to this time no thought seems to have come to the mind of any one that the company would not survive the difficulties into which it was plunging. Its attention through the summer had been largely devoted to the aeronautical branch of the business; just how much business it did in the motorcycle branch is uncertain but evidently not a great deal, its plans for that having been largely for the future through the development of the Model G motor. In anticipation of the increase of business in both branches which it had expected, new buildings had been erected and equipped for

service at a large expense, the bills for which, during the fall began to come in for payment. In anticipation of its Model G business, together with that of the Marvel Motorcycle Company's contract, large orders were placed and in various ways its liabilities became heavy and ultimately pressing. With the beginning of the Wright suit its aeronautical business had almost entirely ceased. It could not sell aeroplanes except with a guaranty to the purchasers against the result of that action and, for its own safety, had been forced to adopt the so-called restrictive contract the logical effect of which was to greatly limit its aeroplane sales. It had become necessary to borrow money to tide over temporary emergencies, which loan later became a source of difficulty. The action brought by the Wrights, with the widespread accompanying publicity, must necessarily have gone far to lessen the belief of the public in the ultimate success of the plaintiff, and when added to this came the internal dissensions and litigations with the public interest which they naturally excited, a restriction and limiting of plaintiff's credit was the inevitable result. Bills which there was no money to meet became more and more pressing. Sales fell off and cash income for current expenses became less and less easy, while, as is the ordinary experience of those in financial difficulties, the less cash in hand the more insistent the creditors became. Toward the end on one or more occasions plaintiff was unable to meet its weekly payrolls and the same were paid by Mr. Curtiss from his individual funds. In the effort to carry plaintiff along and avoid the bankruptcy various plans were discussed. The defendant Bishop advanced the suggestion of a $50,000 bond issue, with the statement that he would be willing to take $10,000 of it; just who was to take the remaining $40,000, issued by a company whose credit had been shaken as had this plaintiff's, is not made clear unless it be he expected them to be carried by the defendants Curtiss and Wheeler. If such was the thought their hesitancy in so doing can easily be understood. Another proposition of the defendant Bishop was that the company be placed under a voting trust which would eliminate both Mr. Curtiss and Mr. Herring from any control of its affairs. The proposition was at first acceded to but subsequently rejected by Mr. Curtiss who, after consultation with the defendant Wheeler, believed it not free from sinister design against himself and his welfare by the man whom he understood Mr. Bishop proposed to intrust with the details of the plan. Whether that lack of confidence in the lawyer employed by Mr. Bishop was well founded is of little importance. The only thing that could be done was to obtain a large amount of money with which to pay off the liabilities; without this the elimination of the then management,

whether by a voting trust, or what not, could avail nothing. Running all through this unhappy condition of affairs was the ill feeling between Mr. Curtiss and Mr. Herring engendered, on the one side, by disappointment over Mr. Herring's lack of practical ability as well as his omission to keep the promise he had so positively given, and on the other apparently by Mr. Herring's failure to acquire for himself the financial reward he had expected to reap from Mr. Curtiss' efforts and genius. That there came a time when Mr. Curtiss determined to get away from any connection with Mr. Herring, and openly expressed that decision, is true and that he would welcome any honest move which would bring about a " show down " between them may be believed; but neither his dislike of Mr. Herring, his conviction that plaintiff could not succeed with Mr. Herring connected with its management, his determination to cancel his relations and his welcome of proper effort which might bring it to pass, is proof of fraudulent attempt or fraudulent action. Just when the suggestion of possible bankruptcy was made is uncertain. The witness Fancuilli says there was talk of it in December and that he selected a lawyer to whom the books of plaintiff were submitted and by whom, after examination, plaintiff was advised bankruptcy could be brought about. The force of this statement is much weakened by Mr. Fancuilli's admissions on cross-examination and its credibility entirely destroyed by outside circumstance. The financial books of plaintiff it is evident were not removed from the Hammondsport office. They were in charge of Mr. Hall, used in the daily affairs of the business and could not have been taken away without interference with and disruption of the ordinary routine of the office with consequent knowledge to everybody. Neither Genung nor any one else who has been called knew of any such absence. In addition, the fact that but one or two books, as conceded by Mr. Fancuilli himself, were taken to New York shows the utter unlikeliness of the story. That the stock books which were in charge of Mr. Masson, and not kept in plaintiff's office, were taken by him to New York for use in connection with the action against Mr. Herring accords with all the known facts and circumstances, including the story of Mr. Fancuilli as finally left upon cross-examination. Again upon the twenty-ninth of January, we find Mr. McHarg, writing for his firm (Noble, Jackson & Hubbard) to the defendant Wheeler a suggestion that through bankruptcy might be found the way out of the increasing difficulties. The very tone and phraseology of this letter utterly disprove any theory of his having more than a month previously advised such action. A traveling salesman named Herman, who had sold plaintiff large bills of goods, and knew of their financial difficulties,

somewhere about the same time made a similar suggestion and brought to Hammondsport a Detroit lawyer who after staying some days appears to have departed without convincing any one of the advisability of retaining his services for that purpose. On March twelfth a meeting of the board of directors was held for the express purpose of discussing plaintiff's financial difficulties. At that meeting the attorney for the defendant Bishop was present and plaintiff's general financial affairs were discussed, it being generally believed that the company was on the verge of bankruptcy. In the talk with Mr. Mann (Mr. Bishop's lawyer) the defendant Curtiss in response to a suggestion that the defendant Bishop felt very keenly about a company with which he was connected going into bankruptcy, expressed a willingness to join in a reorganization of the company, providing Mr. Herring could be eliminated, and it was agreed that a list of plaintiff's creditors should be sent Mr. Mann, that he and Mr. Bishop might have knowledge of the exact condition of affairs and possibly devise some plan of action. Such a list was prepared but not in time to avert the proceedings in bankruptcy. The Standard Audit Company which had been employed when plaintiff was first organized had presented a claim for services amounting to approximately $1,100. The resolution authorizing the employment had limited the amount to be expended for the purpose to $200 and plaintiff's officers had refused to pay the bill for the larger amount. In the winter of 1910, that company commenced an action upon this claim which was followed by an arrangement that same should be settled in full for $500. At this time plaintiff was under constant pressure from its creditors and unable to obtain sufficient funds to meet their claims. After considerable delay, however, its check for $500 was drawn and taken by Mr. Curtiss to the bank to be certified and sent on to settle the action, but the bank declined to honor it. A similar check for $500 was drawn about two weeks later for the same purpose and presented to the bank by Mr. Curtiss who was again refused. Whatever reason the bank may have had for refusing payment of the second check, when the first one was presented for certification plaintiff's account did not contain enough free money to meet it. There was an apparent balance of over $2,000, but the most of this consisted of credits for sight drafts made by plaintiff against its customers and deposited for collection with the understanding that same should not be checked against until their returns had been received; eliminating those credits the account was insufficient and the bank refused to permit plaintiff to draw against them or to overdraw. It is in evidence that the bank gave also as a reason that sufficient moneys should be kept by plaintiff to meet its then weekly payroll

but I am disposed to believe, after considering all the circumstances, that talk related to the second check of $500 drawn upon March twenty-first. At any rate, the claim not having been paid, judgment was taken for the full amount and a levy made upon property belonging to plaintiff just before the meeting of the board of directors held on March twenty-sixth, when the matter was discussed but no solution of the trouble found by the directors. This judgment and the levy constituted the act of bankruptcy which led defendant Bank of Hammondsport and its associated creditors to institute the involuntary proceedings as related above. During the time that the negotiations with the Standard Audit Company were in progress and continuing to the time of the levy, or thereabouts, plaintiff had collected from various sources considerable sums of money and used same in payment of certain of its obligations. These obligations were just debts admitted to be owing by it, whereas the Standard Audit claim was subject to serious dispute as to its amount, the compromise settlement agreed upon being more than double the sum originally authorized for the services. Probably the defendants Curtiss and Wheeler might have paid this claim instead of some of the others that they did. It is likewise true that they might have paid it, as Mr. Curtiss did some of the payrolls, from their own funds; but I can derive no fraudulent intent or purpose from their failure either to pay it personally or to give it preference over undisputed debts. Neither can it be held that the failure to use that money to pay this $500 made any serious difference with the final outcome. Plaintiff had a large indebtedness long past due, for most of which the creditors had refused to extend the time of payment; a number of creditors were threatening suit and it was just as certain as anything can be that some of them would very shortly obtain judgment. The difficulties had reached their culmination and plaintiff was beyond saving. The petition in bankruptcy was filed and a subsequent marshaling of plaintiff's assets and liabilities demonstrated that its nominal assets, which included the $10,000 paid in by Mr. Curtis from the sale of the three aeroplanes, amounted to $60,906.42 as against $93,527.54 of liabilities. These liabilities included a number of thousand dollars in claims presented by firms to which orders had been given for parts of the Model G motors and for motorcyles, which had entailed upon the claimants large expense without any return but which they ultimately did not present to the trustee for payment. Just why they were not presented does not appear. That they were real liabilities is established, but even with them out of the computation and some $5,000 of profits, that were made by the receiver, added, plaintiff's estate in the end paid only about thirty cents on a dollar.

At the close of the bankruptcy litigation involving these same questions the special master found this insolvency was not caused by fraud nor the result of a conspiracy and summarizes its causes, which in an abbreviated form are as follows, and in which conclusions I fully concur:

a. The over capitalization of the company, and the lack of working capital owing to the failure of Herring to do as he agreed.

b. The Wright suit and the liability imposed thereby; the publicity and loss of credit resulting therefrom and the necessity of giving guaranties to purchasers against infringement action with the consequent necessity of restricting the use of aeroplanes in the hands of purchasers.

c. The action brought by Herring against the directors, charging fraud and embezzlement, and the publicity resulting therefrom.

d. The delay and inability to complete the Model G motors and obtain motorcycle parts, owing to litigation and loss of credit and the unwillingness of creditors to deliver.

e. The inability to borrow money; including in this *résumé* the effect of the action brought by plaintiff against Herring.

In this conclusion the diversion from plaintiff by Mr. Curtiss of the moneys derived from the Aeronautical Society's machine, the Governor's Island, St. Louis and Chicago flights and the sale of the three machines through Hamilton, and its effect upon this bankruptcy has been carefully considered; the total amount of these moneys is not over $11,000 and would have been insufficient by many thousands of dollars to bring plaintiff's actual assets into equality with its liabilities. At the best, with these moneys in the treasury, the time of its bankruptcy would have been postponed only a short time. The conditions were inherent, could not be healed and in the end must have resulted the same. While retention of this money may or may not have hastened the insolvency, it was not the producing cause and the defendant Curtiss, much less the defendant Wheeler, is not to be held responsible for fraud and conspiracy to bring the insolvency about because thereof. Quite likely Mr. Curtiss ought still in good conscience to pay that money with its interest over to the trustee for distribution among plaintiff's creditors, but such a judgment cannot be ordered in this action.

What followed the bankruptcy may be disposed of in a few words. In the litigation before the special master, Judge Wheeler was more or less active as against the contest instituted by Mr. Herring and in support of the claim of insolvency. Mr. Curtiss was a witness in that proceeding as were also others of the defendants. It is said that an agreement had been made, whereby Mr. Curtiss was

to pay the creditors in full. This he denies. It makes no difference here. The fact remains that the concern was, at the time the promise is said to have been made, actually insolvent and the duty rested upon its officers to aid the court in establishing that fact to the end that its assets might be properly apportioned among its creditors. Anything less than this would have been a violation of duty and no fraud can be predicated upon full performance of duty.

Whether the act of bankruptcy in and of itself released Mr. Curtiss and Mr. Herring from the obligation of their respective three years' executory contracts may be a question. *Central Trust Co.* v. *Chicago Auditorium Assn.*, 240 U. S. 581, and cases cited.

Whether or not the contracts passed to the trustee, plaintiff became, and ever thereafter was, unable to perform on its own part. The receiver shortly after his appointment notified Mr. Curtiss that his services were no longer wanted, and from then neither he nor the plaintiff paid his stipulated salary to Mr. Curtiss; after the expiration of the ninety days of grace, which the contract allowed, he availed himself of the express provision in the contract, served the proper notices and from thenceforth was freed from all its obligations.

On April 15, 1911, a sale of plaintiff's real estate and plant equipment was had at public auction; the defendant Glenn H. Curtiss became the purchaser, the property being sold free and clear so that the amount due upon a $15,000 mortgage, originally given him by Mr. Herring and still held by him, served to apply toward such purchase money. The history of this sale is interesting as showing the manner in which nearly everything done by the receiver, the trustee in bankruptcy or any one else connected with the matter was contested. Three sales were had at each of which the property was struck off to Mr. Curtiss. Confirmation of the report of the first sale was opposed on the ground that the property had been struck off for an amount largely below its value. The second, against which this objection does not seem to have been interposed, was confirmed and then reopened because of the claim of Mr. Herring's attorney that Mr. Curtiss' mortgage was not to enter into the purchase price, notwithstanding the sale had been made upon that express condition. A third sale was had; an appeal was taken to the District Court from the referee's refusal to hold against Mr. Curtiss' right to apply his mortgage toward the purchase price; the order was finally confirmed and ultimately Mr. Curtiss received a deed to the property. These sales were all had openly and after due advertisement, and Mr. Curtiss seems to have been the only real bidder, although a number of bids were interposed,

by interests representing Mr. Herring, for the purpose of forcing up the price. The property did not bring its book value as carried by plaintiff but that it brought somewhere near its actual value (located as it was in a small inland town and not a part of a going concern) seems to have been the opinion of those interested, including Mr. Herring himself who shortly before had sent out a circular letter, stating in substance the property was worth not to exceed $25,000.

March 14, 1912, the trustee in bankruptcy, in order to wind up and dispose of the property and estate, sold by two separate public offers the uncollected claims owing the estate, and the good will, trade marks, patents, inventions, etc. The purchaser in both instances was the defendant Monroe Wheeler who bid ten dollars for the accounts, etc., and five dollars for the remaining assets. The sale was confirmed and the property assigned to Judge Wheeler, whose estimate of its value may be judged by the fact that he never reduced or attempted to reduce any of it into his possession until or at about the time this action was begun when he arranged for the delivery of the books of accounts to his attorney. The inventions, applications for patents, etc., which included fifty-one claims filed by Mr. Herring as well as Mr. Curtiss' interest in the Aerial Experiment Association's discoveries and inventions together with those belonging to him individually, Judge Wheeler offered to give to Mr. Curtiss who refused them. Later upon the organization of the Curtiss Aeroplane and Motor Corporation the real estate in question became its property as did also the interest in the patents, inventions, etc., Mr. Wheeler had purchased at the trustee's sale.

In addition to the charges of fraud and conspiracy hereinbefore alluded to, plaintiff bases its claim for an accounting upon the theory that both Mr. Wheeler and Mr. Curtiss at the time of the just above-described sales were directors of the plaintiff corporation and, therefore, are conclusively presumed in law to have taken the properties as trustees for it, and must now account to it for any profit they may have derived therefrom. That such is the ordinary rule of the law may be admitted. *LaForge* v. *Cornell*, 127 N. Y. Supp. 453; *English* v. *McIntyre*, 29 App. Div. 439; *Clark* v. *Bird*, 66 id. 284, 287; *Waterbury* v. *Barry*, 145 id. 773, 781; *Lillenthal* v. *Betz*, 108 id. 222; 185 N. Y. 153; *Michel* v. *Betz*, 108 App. Div. 241.

These cases together with others bearing upon the subject which I have read, are all based upon an actual trust relation existing at the time of the transaction complained of; the improper dealing was with property in which the one injured had an actual personal right of ownership or possession and he had suffered actual pecuni-

ary loss through improper conduct of the agent. In determining the right of Mr. Curtiss and Judge Wheeler to take for themselves these properties under the trustees' sale we are called upon to consider a situation differing entirely from that. It is true that they were the nominal directors and officers of the corporation, but the corporation was unique in that it had neither form nor substance. From the time its bankruptcy was finally adjudicated it had, at best, been only an empty shell. To use a somewhat far-fetched description, it had neither pride of ancestry nor hope of posterity. While it existed upon paper, no one, so far as appears, considered it as a going business nor acknowledged to it any obligation of duty. It existed on paper only, and would have so continued but for the fact that Mr. Herring, defeated in the bankruptcy litigation, later realized that it might still be utilized to force from his erstwhile associates moneys they long afterward acquired by the happy combination of personal ability and fortuitous circumstance. While the corporation was not dissolved, its financial plight ended its usefulness and it was abandoned by all concerned. None of these defendants ever acted as directors of the corporation after the filing of the petition of bankruptcy and admittedly regarded their functions then ended; in all except name the trust relations theretofore existing had ceased. It would seem under such circumstances that the true rule by which the relations of the defendants Curtiss and Wheeler to plaintiff at the time of these respective sales is that pointed out in *People ex rel. Floyd* v. *Conklin,* 7 Hun, 188, 193; *Bonnell* v. *Griswold,* 80 N. Y. 129, 139; *Costello* v. *Outterson,* 112 App. Div. 680; *Tiffany* v. *Smith,* 124 N. Y. Supp. 85. The same principle is also upheld in our sister state of Pennsylvania, where an insolvent corporation had voluntarily made an assignment of its property for the benefit of its creditors, thus by its own act leaving it, as is plaintiff, a mere shell of a corporation. That court intimates a belief that under such circumstances the official relations of corporate officers cease, leaving them free from the obligation of the rule now sought to be invoked by plaintiff. *Hammond's Appeal,* 123 Penn. St. 503.

But the abstract proposition of law that officers and directors of an insolvent corporation, while nominally continued in office, are absolved from their trust obligation, is in the case at bar of very little moment. If it be assumed that in their relations to plaintiff and its property they are to be held to the strict letter of the law plaintiff invokes, an insuperable difficulty to the application of the rule to this case nevertheless remains, namely, neither the real estate purchased by Mr. Curtiss nor the personal property, including the patents, applications for patents and inventions, belonged to

plaintiff. Two years before the sale of the real estate and nearly three years before the sale of the personal property both had by operation of law vested absolutely and completely in the defendant Parkhurst as trustee. After the adjudication in bankruptcy plaintiff had no right, title nor interest in the property except for any surplus after the debts and expenses were fully paid. The trustee was bound to sell it to the best advantage that he could and apportion the proceeds among plaintiff's creditors. In the sale of the personal property, which apparently no one interested deemed of any particular money value, the ordinary methods were followed. In that of the real estate, prolonged and determined efforts were had by the creditors, with the co-operation of the defendant Parkhurst, to procure for it a full price. All three sales were open and above board. They were confirmed by the court in the regular way and until now no question as to the right of these defendants to purchase and hold for themselves the property was ever raised, and in my judgment cannot now be justly interposed.

The little piece of land which had been sold by plaintiff to the Marvel Motorcycle Company was retained by it until November 22, 1912, when that company having, by reason of plaintiff's failure to perform the contracts spoken of, become insolvent, it deeded the property over to the defendant Lena P. Curtiss in satisfaction of an indebtedness it owed her; from Mrs. Curtiss it ultimately came into the ownership of the Curtiss Aeroplane and Motor Corporation, as did also the real estate purchased by Mr. Curtiss and some of the personal property bid in by Judge Wheeler. Like the others, this transaction is said to be tinged with fraud but there is even less opportunity for such a charge in connection therewith. Nothing in the evidence contradicts or throws suspicion upon the *bona fides* of the sale to Mrs. Curtiss or clouds her title to the property.

Judgment is directed in accordance with the foregoing, with costs to each answering defendant, other than the defendant Bishop (he having formally waived costs); the direction as to costs is intended to include the defendant Parkhurst, as trustee, who at the close of plaintiff's case was absolved from the charges of fraud, the action against him not, however, having been then dismissed.

Judgment accordingly.